EXHIBIT 1

Andrew M. THURN, Plaintiff,

v.

Kenneth APFEL, Commissioner of
Social Security, Defendant.

No. 96–1135–CV–W–BC–SSA.

United States District Court,
W.D. Missouri,
Western Division.

Jan. 7, 1998.

Daniel Devine, Kansas City, MO, for Plaintiff.

Brett Leopold, U.S. Atty., Kansas City, MO, for Defendant.

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

LARSEN, United States Magistrate Judge.

Plaintiff Andrew M. Thurn seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401, et seq. Plaintiff argues that the ALJ's finding that plaintiff could return to his past relevant work is not supported by substantial evidence, the ALJ did not properly evaluate plaintiff's complaints of pain and functional restrictions, and the ALJ did not properly consider the testimony of plaintiff's subjective complaints of disability were exaggerated, plaintiff's mother's testimony was not credible, and plaintiff can return to his past relevant work as a cashier/clerk are supported by substantial evidence in the record. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On December 13, 1993, plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since January 2, 1988. At the administrative hearing, plaintiff amended his onset date to December 1, 1993. Plaintiff's disability stems from diabetes, diabetic retinopathy, and high blood pressure. Plaintiff's application was denied initially and upon reconsideration. On June 21, 1995, a hearing was held before an Administrative Law Judge. On October 12, 1995, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 9, 1996, after consideration of additional medical evidence, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Johnson v. Chater,* 108 F.3d 178, 179 (8th Cir.1997); *Andler v. Chater,* 100 F.3d 1389, 1392 (8th Cir.1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) (citing *Steadman v. Securities & Exchange Commission,* 450 U.S. 91, 99, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evi-

dence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. at 401; *Jernigan v. Sullivan,* 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposition decision." *Id.; Clarke v. Bowen,* 843 F.2d 271, 272–73 (8th Cir.1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. *Griffon v. Bowen,* 856 F.2d 1150, 1153–54 (8th Cir. 1988); *McMillian v. Schweiker,* 697 F.2d 215, 220–21 (8th Cir.1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, *ex seq.* The five-step sequential evaluation process use by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

Yes = not disabled.

No = got to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

No = not disabled.

Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.

No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.

Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

Yes = disabled.

No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff, his mother, and vocational expert Marianne Lumpe in addition to documentary evidence admitted at the hearing. A summary of plaintiff's medical records and the testimony follows.

### A. SUMMARY OF MEDICAL RECORDS

On January 19, 1979, plaintiff was diagnosed with juvenile onset diabetes mellitus (Tr. at 113–116, 156–159). He was seen at Children's Mercy Hospital eight times after his diagnosis for follow up (Tr. at 137–144, 148–156). The records indicate that plaintiff had regular check ups at Children's Mercy Hospital through 1981 (Tr. at 127–133, 135–136, 145–147). Those records also indicate that plaintiff's care giver was responsible for keeping track of plaintiff's caloric intake, the number of grams of carbohydrate and protein plaintiff consumed on a daily basis, and the times of his meals and snacks, and was also responsible for daily monitoring of plaintiff's blood sugar level and giving twice daily injections of insulin.

On October 31, 1984, plaintiff was diagnosed with very minimal scoliosis of the lumbar spine which is not a basis for plaintiff's claim of disability (Tr. at 121–123, 126, 160).

The first report of blurred vision in the medical records appeared on September 5, 1985, when plaintiff, at age 13, visited the Children's Mercy Hospital Eye Clinic complaining that his eyes became blurred when reading (Tr. at 125). His eye exam was

recorded as normal (Tr. at 125). On September 25, 1985, plaintiff returned to the Eye Clinic for his follow-up exam and again complained of blurred vision (Tr. at 124). The "prescription" was listed as "try day snack earlier in day. If not better, rx" (Tr. at 124).

On September 1, 1988, plaintiff was seen at the Children's Mercy Hospital for an Emergency Room evaluation of diabetes control at the request of Dr. Howard (Tr. at 118). Plaintiff was 16 at the time. The records indicate that plaintiff was using a glucometer at home but was checking his sugar infrequently rather than daily (Tr. at 118). Plaintiff had no physical complaints at that time (Tr. at 118).

About two weeks later, on September 13, 1988, plaintiff had an appointment at the Children's Mercy Hospital Diabetes Clinic (Tr. at 119–120, 162). The report listed that plaintiff was doing no exercise, and under "Problems: (Insulin reactions, hospitalizations, illnesses, school, home, emotional)" it was listed that plaintiff was "not highly motivated" (Tr. at 119). The report also indicated that plaintiff was not following the meal plan or glucose monitoring (Tr. at 119). Dr. Campbell Howard noted that plaintiff was not "following a good diabetic meal plan and usually does not have between meal snacks." Plaintiff's sugar count was 283 that day.[1] Dr. Howard listed an impression as follows: "insulin dependent diabetes mellitus with poor compliance and a rather negative attitude toward his own health care." (Tr. at 162).

The next set of medical records begins in August 1991, when plaintiff was 18 years old. On August 14, 1991, plaintiff saw Dr. P. Kohl at the Children's Mercy Hospital Eye Clinic (Tr. at 117). Plaintiff's vision was "within normal limits", he had good visual acuity and mild myopia. Dr. Kohl recommended that plaintiff "hold off on glasses for now." (Tr. at 117).

The following week, plaintiff went to the Truman Medical Center's Department of Ophthalmology for the first time for an eye exam (Tr. at 175–176, 253).

On September 11, 1992, when plaintiff was 20 years old, he went to the Truman Medical Center's emergency room because of a sore throat and ear pain (Tr. at 172). The following spring, he returned to Truman's emergency room complaining of flue symptoms (Tr. at 170–171). Those records indicate that plaintiff's diabetes "has been well controlled" (Tr. at 170–171). That summer, on June 29, 1993, plaintiff again went to Truman's emergency room complaining of a sore throat at (Tr. at 168–169).

On September 10, 1993, at age 21, plaintiff had his first laser surgery (Tr. at 258) Dr. Brett Teague performed the outpatient procedure on plaintiff's left eye (Tr. at 258). The procedure was discontinued because plaintiff experienced discomfort and because of "patient movement"; however, the records indicate that plaintiff tolerated the procedure well and was told to come back in a month (Tr. at 258).

Later that month, on September 29, 1993, plaintiff again went to the Truman Medical Center's emergency room complaining that he had had a sore throat for the past month (Tr. at 166–167). He also indicated that he was seeing "big blotches" and that his eye was worse than before his September 10 laser procedure (Tr. at 257).

On October 7, 1993, plaintiff went to the Truman Medical Center Family Practice Clinic (Tr. at 165). Plaintiff stated that he felt fine and was having no headaches. The records indicate that plaintiff's blood pressure was under control.[2] Toward the end of the month, on October 25, plaintiff received laser treatment in both eyes (Tr. at 252, 255).

On December 13, 1993, plaintiff filed his application for disability benefits.

---

1. There is nothing in the record indicating what is a "normal" blood sugar level. However, in plaintiff's records of blood sugar readings, he indicating taking extra units of insulin at blood sugar levels of 216, 263, 308, 216, 247, 216, 199, 232 and 268 (Tr. at 215, 217, 218, 222, 227).

2. The records also state as follows: "O: Eyes—fundus—R eye—exudates, hemorrhages, microa-

neurysms, neovascularzation, refracting areas. L eye—refracting areas, exudates" however, there is nothing in this record indicating what "O" means. It is unclear whether these are things plaintiff complained of, or whether they are things the examiner checked for, or were things plaintiff was suffering.

On January 11, 1994, plaintiff went to Truman Medical Center complaining of recurring tonsillitis (Tr. at 205). The records indicate that plaintiff preferred to wait until the summer when school was over to have a tonsillectomy (Tr. at 205).

On January 13, 1994, plaintiff saw Dr. Norman McCarthy who performed an ophthalmological exam (Tr. at 187–189). Two days later, Dr. McCarthy wrote a letter to the Office of Disability Determinations stating that plaintiff had complained of blurred vision for both distance and near for the past year with the left eye being worse than the right eye. Plaintiff had no other ocular or visual complaints. He had been wearing glasses for the last year.

Dr. McCarthy found that plaintiff's visual acuity with correction was 20/66 in the eye and 20/40 in the left eye. The external exam was unremarkable for either eye. Visual fields were measured on the Golmann device with no significant findings in either eye. Results of a slit lamp exam were unremarkable for either eye. A funduscopic exam revealed evidence of neovascular changes in both eyes with the right eye more severe as well as occasional blot hemorrhages and microaneurysms. Dr. McCarthy's opinion was that plaintiff "has proliferative diabetic retinopathy in both eyes, which has resulted in visual acuity changes, with the right eye more severe."

On April 11, 1994, plaintiff had laser treatment at Truman Medical Center.[3] On June 1, 1994, plaintiff had a fluorescein angiography, which is an injection through an intravenous needle to visualize the blood supply of the retina (Tr. at 251, 279). Five days later, Dr. Jonathan Drummond performed laser treatment on plaintiff's right eye (Tr. at 251, 267, 277–278). Two days later, plaintiff had a tonsillectomy at Truman Medical Center (Tr. at 211–212).

On August 2, 1994, plaintiff had another laser procedure on both eyes at Truman Medical Center (Tr. at 249, 275–776). Exactly two weeks later, he had another laser procedure done on his right eye (Tr. at 249, 273–274).

The next visit to Truman Medical Center occurred March 16, 1995 (Tr. at 248). Plaintiff complained of "bleeders" and "floaters" but indicated he thought the floaters were clearing (Tr. at 248). Plaintiff's vision was reported as 20/40 and 20/50 (Tr. at 248). On March 28, 1995, plaintiff went back to Truman Medical Center complaining of blurry vision (Tr. at 247). His vision was reported as 20/70 and 20/40 (Tr. at 247).

On April 11, 1995, plaintiff had another laser procedure performed on both eyes by Dr. Orlando Galindez (Tr. at 246–266).

On April 25, 1995, plaintiff went to the Family Practice Clinic at Truman Medical Center and complained of headaches for the first time (Tr. at 204). He also reported blurred vision.

Finally, on September 12, 1995, plaintiff had his final laser procedure as reflected in these records (Tr. at 260–264). The procedure was performed on plaintiff's right eye by Dr. Jonathan Drummond who noted in the Operational Report that plaintiff "has had extensive previous laser work".

## B. VOCATIONAL REPORT

On December 1, 1993, plaintiff visited the Rehabilitation Institute of Health Midwest to participate in vocational testing after a referral was made by the Independence Division of Vocational Rehabilitation (Tr. at 177–180). A report was prepared by Jackie Belcher, M.S., Vocational Evaluator. The report stated that plaintiff:

> reports that he ... began having difficulty with his vision approximately three years ago. He states that he has "spotty vision" which is not corrected by glasses. Thurn rates his general health as "good" and is taking Insulin, as well as blood pressure medications. Medical referral information is congruent with Mr. Thurn's self-report.

(Tr. at 177, 181). The report indicates that plaintiff identified problem areas which may cause him difficulty in obtaining and/or maintaining competitive employment as: "1) I cannot find a job which pays enough money.

---

**3.** I am assuming plaintiff had the treatment although the only records of this visit to Truman are a flowsheet and consent form (Tr. at 266–

269). There is no Operative Report as there are for the other laser treatments.

2) I do not have adequate training/ experience to get the kind of job I want." (Tr. at 178). Plaintiff's vocational goal as of December 1993 was "to enter college to study Marketing or Law." (Tr. at 178).

Although plaintiff testified that he lived with his parents except when he was attending college at CMSU (which he began in the spring 1994 semester), this December 1993 report indicates that plaintiff reported living alone (Tr. at 178). At that time he was a student at Longview Community College with a semester grade point average of 3.5 (Tr. at 178). Ms. Belcher observed that "[n]o physical difficulties were noted or observed during Mr. Thurn's evaluation. He was able to complete all assigned tasks without complain." (Tr. at 178).

Ms. Belcher administered the following tests: the Wechsler Adult Intelligence Scale–Revised, the Wide Range Achievement Scale–Revised 3, the General Aptitude Test Battery, the Career Assessment Interest inventory, and a test to determine plaintiff's ability to reason and follow written instructions (Tr. at 179).

The WAIS–R results indicated that plaintiff has a full scale I.Q. of 107 which is in the upper average range of intellectual functioning (Tr. at 179). He was listed as being in the 67th percentile. The report states that "[s]trength was exhibited on the Picture Completion subtest, which evaluates level of perceptual discrimination, and the Block Design subtest, which measures analysis of spatial relationships and application of logic." (Tr. at 179). Plaintiff received his highest marks in these sections.

The WRAT 3 results indicated that plaintiff was at a 5th grade level in spelling (classified as borderline) but at a high school level in reading and math (classified as average).

The General Aptitude Test Battery measures vocational potential (Tr. at 180). Plaintiff scored in the average range with the exception of manual dexterity which he scored in the average/high-average range (Tr. at 180). Plaintiff met 23 "cutting scores" of the 66 occupational groups.

The Career Assessment Inventory measures general vocational interest (Tr. at 180). The report states that plaintiff "appears to have a wide range of interests, but indicates a preference for mechanical activities, skilled trades, and technical occupations.... On the Basic Area Interest scale, Law/Politics, Sales, and Protective Service were cites as Very High interest areas." (Tr. at 180).

Plaintiff's score on the test measuring reasoning and ability to follow written instructions was in the above-average range (Tr. at 181).

The "Summary and Recommendations" section of the report states that "Mr. Thurn's present vocational goal is to enter college to study either Marketing or Law.... Not only does Mr. Thurn demonstrate the capability to complete the training for these occupations, the physical demands of these jobs are within his limitations." (Tr. at 181).

The following month, plaintiff became a full-time student at Central Missouri State University.

## C. SUMMARY OF TESTIMONY

During the hearing, plaintiff and his mother testified, and vocational expert Marianne Lumpe testified at the request of the ALJ.

### 1. Plaintiff's testimony.

Plaintiff testified than he was born on August 31, 1972, making him 22 at the time of the administrative hearing (Tr. at 34). He is 5'8" tall and weighs about 155 pounds (Tr. at 52). Plaintiff is not married and his permanent residence is with his parents in Grain Valley, Missouri (Tr. at 34). Plaintiff finished 12 years of school but was short some credits so he obtained his GED (Tr. at 35).

Plaintiff is a full-time student at Central Missouri State University ("CMSU") studying criminal justice (Tr. at 35, 37, 38). He is studying criminal justice because he is interested in it, but he does not know what his future vocational aspects are (Tr. at 42). Plaintiff testified that originally his major was commercial art, but that he had to change his major because he could not draw due to his poor vision (Tr. at 46). His tuition and books are paid for through vocational rehabilitation (Tr. at 35). Plaintiff lives on campus during the school year (Tr. at 42–43). During the regular semester he lives in a dorm but during the summer he lives in an

apartment by himself (Tr. at 43). Plaintiff began college at CMSU in the spring 1994 semester (Tr. at 37). He previously took classes on a part-time basis at Longview Community College (Tr. at 37). Plaintiff attends classes five days per week and also attends the summer sessions (Tr. at 37–38). He carries 15 credit hours during the regular semester and 6 during the summer sessions (Tr. at 38). Plaintiff has a "C" average (Tr. at 38). He has had problems in two classes—a computer course because he could not see the computer to do the assignments and a literature class because he could not read the assignments. He failed the computer course and received a very low mark in the literature class (Tr. at 46–47). Plaintiff was in the process of taking the computer course over at the time of the hearing (Tr. at 47).

Plaintiff has worked off and on at Winstead's Restaurant from at least 1990 to 1998 with his longest periods of employment being six months and four months (Tr. at 35–36). Plaintiff performed different duties, but his main occupation was a cook (Tr. at 36). Plaintiff left that job to go to school (Tr. at 36). From 1989 to 1992, plaintiff worked off and on for his father's house-painting business cleaning up and moving equipment (Tr. at 36, 94, 102). From August 1991 until February 1992, plaintiff worked at an Amoco station as a cashier and clerk (Tr. at 36). He left that job when the employer went out of business (Tr. at 94).

Plaintiff has high blood pressure and diabetes (Tr. at 40). He has been insulin-dependent since he was six years old, and his diabetes is controlled by medication (Tr. at 40). The diabetes makes plaintiff sick to his stomach, dizzy, and excessively tired because his blood sugar level sometimes gets elevated or low (Tr. at 41, 47). Those symptoms normally last for 10 to 30 minutes and occur about three or four times per month (Tr. at 47). His diabetes also causes tingling in his feet (Tr. at 49). Plaintiff's high blood pressure began about two years before the hearing and is still not controlled by medication (Tr. at 40). Plaintiff's high blood pressure contributes to his eye problems and causes severe headaches and dizziness (Tr. at 40–41). The headaches started about a year before the administrative hearing (Tr. at 51).

His high blood pressure also causes swelling in his feet and ankles which makes it hard for him to walk more than about 3 or 4 city blocks or to stand for longer than an hour (Tr. at 49). Plaintiff sleeps with his feet elevated and on several occasions has had to elevate his feet after classes in order to help the swelling go down (Tr. at 50). Plaintiff tries to keep his feet elevated for at least an hour and usually has to do this almost daily (Tr. at 50). Plaintiff's doctors have advised him not to do any strenuous activity or lifting because that could elevate his blood pressure and make his eyes worse (Tr. at 51). The most plaintiff could comfortably lift or carry would be 15 or .20 pounds (Tr. at 51). Plaintiff often has trouble getting to sleep because of his high blood pressure, and also has problems waking up or being tired throughout the day because of his insulin (Tr. at 51). Plaintiff normally gets 7 to 8 hours of sleep per night and it takes him anywhere from 30 minutes to several hours to fall asleep (Tr. at 52).

Plaintiff testified that at the time of the hearing, he had had five laser surgeries on each eye (Tr. at 44). His most recent surgery was in May of 1995, about one month before the administrative hearing (Tr. at 44). Laser surgery is required each time blood vessels burst in plaintiff's eyes (Tr. at 44). When plaintiff's vision improves, he has problems with "floaters" which makes it difficult for plaintiff to read (Tr. at 46). Plaintiff is seen at the eye clinic every three months (Tr. at 53).

Plaintiff testified that sometimes he has just a day at a time when he cannot see, but sometimes when blood vessels rupture in his eye, he may not be able to see or read for up to two months (Tr. at 39, 41, 45). When that occurs, plaintiff can see well enough to get around by walking and he walks to school (Tr. at 39). He can see a limited range and can see large objects, but he cannot see to read or to tell the time on a wrist watch (Tr. at 40, 45). The ruptured blood vessel causes plaintiff's vision to be blurred and cloudy and he also has a large blotchy area in his eye where the blood is (Tr. at 54). Plaintiff's vision problems have gotten worse over the last couple of years (Tr. at 54). Although the blood vessels have ruptured in both eyes at the same time, they sometimes occur in only

one eye at a time (Tr. at 54). The first time a blood vessel broke in plaintiff's eye was in the summer of 1993 (Tr. at 54). The ruptures can occur as frequently as one per month or plaintiff can go as long as three months without a rupture (Tr. at 55). Plaintiff's vision can be poor because of his high blood pressure and not only when he suffers a blood vessel rupture (Tr. at 56). The blurred vision from high blood pressure occurs up to several times per week and lasts from 10 minutes to the entire day (Tr. at 56).

Plaintiff testified that because of his disability, he has trouble reading, using a computer, and using a typewriter and he sometimes misses classes (Tr. at 38). Plaintiff testified that he misses about 15 days of school per semester (Tr. at 41). Plaintiff has been able to make arrangements with his instructors to turn in papers late, take exams late if he cannot see on the scheduled test date, and being able to miss class without having his absences affect his grades (Tr. at 38–39, 42). Plaintiff sometimes has someone help him work on his computer and type his papers, but he does not have anyone read to him (Tr. at 39). Several times per month, plaintiff is unable to read his assignments (Tr. at 39). He has made arrangements to get text books with large print and a computer screen and printer with larger print to help him when his vision is poor (Tr. at 55).

Plaintiff has a valid driver's license but only drives when his eyes are "at their best" (Tr. at 42). He does not drive at night or when he has a burst capillary in his eye (Tr. at 45). Plaintiff has driven from the CMSU campus to his home in Grain Valley (Tr. at 56). Plaintiff has trouble living by himself because he sometimes cannot read directions to cook and sometimes has trouble drawing up his insulin (Tr. at 43). Plaintiff eats about half of his meals on campus and the rest of the time he prepares microwavable meals (Tr. at 53). Plaintiff has had to give up sports because of his poor vision and has problems going to the movies (Tr. at 53).

### 2. Plaintiff's mother's testimony.

Plaintiff's mother, Caroline Thurn, testified that sometimes when plaintiff's eyes blur, he calls her and she has to make arrangements to go pick him up from college and get him to the doctor (Tr. at 58). Sometimes after a capillary breaks in plaintiff's eye, the doctors have to wait a while for the blood to settle before they can perform the laser surgery (Tr. at 58). The purpose of the laser surgery is to seal off the broken vessel so that it does not continue to bleed (Tr. at 59). If the blood does not dissolve on its own, the doctors have to use a tiny vacuum to remove the blood so they can see where the rupture is (Tr. at 59). Mrs. Thurn testified that each time a vessel ruptures, laser surgery has to be performed or the vessel will make "little arms" which become weaker and rupture faster (Tr. at 59–60). When the ALJ told Mrs. Thurn that plaintiff testified he has ruptures up to once per month but has only had four laser surgeries since his onset date, plaintiff's mother stated that sometimes plaintiff suffers multiple ruptures before the doctors are able to perform the surgery (Tr. at 60). The surgeries are performed in a clinic on an out-patient basis (Tr. at 60).

### 3. Vocational expert testimony.

Vocational expert Marianne Lumpe testified at the request of the ALJ. Ms. Lumpe testified that plaintiff's past work has been in the unskilled medium to heavy range (Tr. at 61). Plaintiff's work as a cook is considered medium unskilled work (Tr. at 61). His work as an industrial cleaner is considered heavy unskilled work (Tr. at 61). A cashier clerk at a gas station is classified as light unskilled work (Tr. at 61–62).

The ALJ asked Ms. Lumpe to assume that plaintiff's condition is as he described in his testimony (Tr. at 62). She testified that a person suffering from the problems plaintiff described would not be able to perform any job (Tr. at 62). Her concerns were plaintiff's excessive absenteeism and liability/safety issues for the employer (Tr. at 62).

### D. DISABILITY REPORTS

In his Disability Report dated December 13, 1993, plaintiff provided the following information:[4] Plaintiff at one time painted

---

4. It should be noted that the report shows that two different people completed this document as there are two very distinct handwritings. In some cases, one person filled out boxes and the other person supplemented the answers. For

houses when he worked for his father, but plaintiff had to quit that job because of his eyes (Tr. at 98). When he left the painting business, plaintiff got a job working at Winstead's (Tr. at 98). He worked as a cook, a waiter, and a dishwasher (Tr. at 102). He stated in the report that at Winstead's he sometimes needed assistance in reading tickets and receipts (Tr. at 98). Plaintiff listed the physical activities his employment involved as follows:

Walking—4 hours

Standing—4 hours

Sitting—none

Bending—frequently

Reaching—frequently

Heaviest weight lifted—20 pounds

Weight frequently lifted/carried—up to 25 pounds

(Tr. at 103).

In his Reconsideration Disability Report completed on May 11, 1994, plaintiff provided the following information: He stated that the vision in his left eye has continually gotten worse and problems were developing in his right eye (Tr. at 106). He stated that he often needs assistance with reading and taking notes in class (Tr. at 106). He reported that a recurring throat problem and high blood pressure cause sporadic changes in his blood sugar levels making it hard to control (Tr. at 106).

When asked how his condition prevents him from working, plaintiff stated as follows:

[B]lurred vision, headaches and pain in eyes, occasional dizziness, sometimes can't see to read at all, eyes are very sensitive to light, depth depreption [sic] is very poor as is pheriphal [sic] vision have to be able to eat on schedule, test blood on schedule (Tr. at 98).

Plaintiff described his daily activities as helping with laundry, cleaning his room, using the dishwasher (Tr. at 101). He stated that his mother does the house cleaning and

cooking (Tr. at 101). Plaintiff's recreational activities include listening to music and drawing when his eyesight allows (Tr. at 101). He goes to school, and doesn't drive more than 4 or 5 miles (Tr. at 101). Although plaintiff testified that before beginning college in the spring of 1994, he had attended Longview Community College on a part-time basis, he did not list that schooling on his Disability Report which was completed on December 13, 1993, just a few weeks before the spring 1994 semester at CMSU began (Tr. at 102, 103).

### E. FINDINGS OF THE ALJ

In determining that plaintiff was not entitled to a period of disability or disability insurance benefits, the ALJ found that plaintiff's testimony regarding his condition was exaggerated (Tr. at 17). He found that plaintiff's attending college full time and maintaining a "C" average is solid evidence that plaintiff's vision problems are under control (Tr. at 17). The ALJ relied on the vocational report from December 1993 and the January 1994 report from Dr. McCarthy, an ophthalmologist, to support a finding that plaintiff is physically and mentally capable of college work and future employment in marketing or law (Tr. at 17).

The ALJ did not give much weight to the testimony of plaintiff's mother because if plaintiff were awarded benefits, it would reduce the future risk that he would become destitute and financially dependent on her (Tr. at 17). He also stated that it is reasonable to discount Mrs. Thurn's testimony because it is consistent with plaintiff's testimony which the ALJ did not find credible (Tr. at 17).

The ALJ found that plaintiff is capable of performing light work and that his past work as a clerk/cashier is classified as light work (Tr. at 18). Because the ALJ found that

example, at page 98, the question is asked "what is your disabling condition?" One person wrote "diabetes, diabetic reton Opithy [sic]—cloudiness off [sic] vision due to leakage of blood into the eye." Another person added "high blood pressure." At page 100 of the transcript, the question "type of treatment or medicines received" is asked after the Truman Medical Center–West hospitalization. One person wrote "laser

ophthalmology/insuline [sic]" and another person added "florascene (eye test), examination, blood pressure medication". On the same page, the question "type of treatment, examination or medicines received" is asked referring to vocational rehabilitation. One person wrote "none" and another person added "have medical records from Truman Yvonne R. McKenzie Counselor".

plaintiff's impairments do not prevent him from returning to his past relevant work as a clerk/cashier, plaintiff was denied benefits at the fourth step of the sequential analysis (Tr. at 18).

## V. PLAINTIFF'S SUBJECTIVE COMPLAINTS

Plaintiff argues that the ALJ did not properly evaluate plaintiff's complaints of pain and functional restrictions.

 The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. *Benskin v. Bowen,* 830 F.2d 878, 882 (8th Cir.1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. *McClees v. Shalala,* 2 F.3d 301, 303 (8th Cir.1993); *Polaski v. Heckler,* 739 F.2d at 1322. The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. *Hall v. Chater,* 62 F.3d 220, 223 (8th Cir.1995); *Robinson v. Sullivan,* 956 F.2d 836, 839 (8th Cir.1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. *Robinson v. Sullivan,* 956 F.2d at 841.

 In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record; observations by third parties and treating and examining physicians; plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Polaski v. Heckler,* 739 at 1322.

### A. PRIOR WORK RECORD

Plaintiff's prior work record supports the ALJ's decision to discredit plaintiff's subjective complaints. Plaintiff worked off and on at Winstead's Restaurant from 1990 to 1993 and quit that job to go to school. From August 1991 until February 1992, plaintiff worked as a cashier/clerk at an Amoco Sta-

tion. He left that job because the employer went out of business. It is noteworthy that on his Disability Report, plaintiff neglected to list his employment at Amoco, which was his most recent job and the only light-duty job he has ever held. Although Part V of the report directed plaintiff to "[l]ist all jobs you have had in the last 15 years before you stopped working", plaintiff did not list his employment at the Amoco station in 1991 and 1992 and testified that he thought that was "before the indicated time."

In addition, the vocational report contains telling information about plaintiff's employment "history." The report indicates that plaintiff identified problem areas which may cause him difficulty in obtaining and/or maintaining competitive employment as: "1) I cannot find a job which pays enough money. 2) I do not have adequate training/experience to get the kind of job I want." (Tr. at 178).

### B. OBSERVATIONS BY THIRD PARTIES

There is little, if any, evidence in the record of observations by third parties. The medical records, for the most part, list plaintiff's complaints, the results of vision tests, and any action that was taken by the physician. Plaintiff's mother did not testify about any observations she made. The only evidence in the record of observations by third parties is contained in the vocational report. During a complete day of administering tests to plaintiff, Ms. Belcher observed that "[n]o physical difficulties were noted or observed during Mr. Thurn's evaluation. He was able to complete all assigned tasks without complaint." (Tr. at 178).

Therefore, the observations of third parties contained in the record support the ALJ's determination that plaintiff's subjective complaints are exaggerated.

### C. DAILY ACTIVITIES

Plaintiff testified that he has trouble reading his assignments, reading directions on food packages, etc. However, the record indicates that plaintiff reported in 1993 that he lived by himself and was a student at Longview Community College with a 3.5 GPA, that he lived by himself during the

semester at CMSU and was making passing grades while maintaining a full course load, and that he occasionally drove himself back and forth from school to his parents' home. Clearly plaintiff's daily activities do not support his subjective complaints of disability.

### D. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff testified that sometimes he has just a day at a time when he cannot see, but sometimes when blood vessels rupture in his eye, he may not be able to see or read for up to two months (Tr. at 39, 41, 45). He testified that when that occurs, he can see well enough to get around by walking and he walks to school (Tr. at 39). He also testified that the blurred vision from high blood pressure occurs up to several times per week and lasts from ten minutes to the entire day (Tr. at 56). Finally, he testified that he has had no one read to him during the times his vision is blurry (Tr. at 39).

I find this testimony internally inconsistent as well as inconsistent with plaintiff's ability to maintain a full college course load with passing grades and inconsistent with the medical records. If plaintiff were unable to read several times per week up to an entire day each time, or if he were unable to read after a vessel rupture for up to two months (keeping in mind his first rupture occurred approximately six months before he became a full-time student at CMSU), I find it hard to believe that plaintiff would be able to pass his classes without having someone read his assignments to him.

In addition, plaintiff testified that he missed approximately 15 days of school per semester because of his vision problems. Since the hearing was held in June 1995, the most recent semester would have been from January to May or June of 1995. However, the medical records indicate that plaintiff did not seek medical attention during January or February of 1995. The only visits to doctors or hospitals during that semester occurred on March 16, 1995, when plaintiff complained of bleeders and floaters and his vision was 20/40 and 20/50; on March 28, 1995, when plaintiff complained of blurry vision and his

vision was 20/70 and 20/40; on April 11, 1995, when plaintiff had a laser procedure performed on both eyes; and on April 25, 1995, when plaintiff complained of headaches for the first time and also blurred vision.[5] There is nothing in the record corroborating plaintiff's testimony that he missed an additional 11 days of class during that semester. Furthermore, plaintiff testified that he missed class because of blood vessel ruptures which required laser surgery; however, plaintiff had laser surgery only once during that entire semester.

### E. PRECIPITATING AND AGGRAVATING FACTORS

There is nothing substantial in the record indicating there are precipitating or aggravating factors.

### F. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

Although plaintiff testified that his blood pressure is not controlled by medication, there is nothing in the medical records indicating plaintiff's physicians continued to change his medication or dosages in an effort to bring his blood pressure under control. In fact, during the two years preceding the administrative hearing, the only mention of plaintiff's blood pressure in the medical records is in an October 7, 1993, report which states that plaintiff's blood pressure was under control.

### G. FUNCTIONAL RESTRICTIONS

There is nothing in any of the medical records suggesting that plaintiff was under any kind of restriction because of his vision problems. In fact, the record indicates that plaintiff has a valid driver's license, lives by himself, and prepares all of his college assignments and exams without having anyone help him with his reading.

**5.** Since all of these days were on weekdays (March 16, 1995, was on a Thursday and the other three appointments were on Tuesdays), I assume these visits accounted for four of plaintiff's absences from class.

## H. CREDIBILITY CONCLUSION

■ Based on the factors outlined in *Polaski v. Heckler*, I find that the ALJ's determination that plaintiff's subjective complaints were not credible is supported by substantial evidence in the record. I further note that the fact that plaintiff is able to maintain passing grades while attending college full time is strong evidence that he is not disabled. *See Grace v. Sullivan*, 901 F.2d 660, 662 (8th Cir.1990) (full-time student able to do full range of light work); *Russell v. Sullivan*, 758 F.Supp. 490, 498 (E.D.Mo.1991) (plaintiff full-time college student living in dorm not disabled); *Shidaker v. Sullivan*, 1991 WL 432114 (N.D.Ind., February 28, 1991) (law student able to attend classes, study and maintain B average not disabled). *See also Pence v. Sullivan*, 977 F.2d 582 (6th Cir.1992) (table), 1992 WL 276724 (despite pain, plaintiff attended classes as a full-time student and therefore not disabled); *Goldfin v. Weinberger*, 381 F.Supp. 171, 174 (E.D.Pa. 1974) (plaintiff full-time student satisfactorily attending classes not disabled).

## VI. CREDIBILITY OF PLAINTIFF'S MOTHER.

Plaintiff argues that the ALJ did not properly consider the testimony of plaintiff's mother. The ALJ stated that there are no official guidelines for evaluating third-party testimony and found Mrs. Thurn not credible based upon her interest in that she had a "future risk" that plaintiff would become destitute and financially dependent on her.

■ The testimony of Mrs. Thurn was very brief and consisted essentially of "medical" testimony. There is nothing in the record indicating Mrs. Turn is qualified to give this kind of testimony. There is nothing in the medical records indicating that "little arms" are formed which become weaker and rupture faster, or that plaintiff ever suffered multiple ruptures before a laser procedure could be performed, or that plaintiff reported a rupture but was told to wait for the blood to settle before the surgery could be performed. Discounting that "medical" testimony leaves little of Mrs. Thurn's testimony to consider. She offered no testimony about her observations and indeed as plaintiff does not live with her it is understandable that she would have little recent evidence of her observations to offer.

Whether Mrs. Thurn had a "financial" interest in this case is really not relevant. Her testimony was not first-hand knowledge, but was merely her recitation of what she believed to be medical facts. I find that the ALJ was entitled to discount Mrs. Thurn's testimony.

## VII. ALJ'S FINDING AT THE FOURTH STEP

Plaintiff argues that the ALJ's finding that plaintiff could return to his past relevant work as a cashier/clerk is not supported by substantial evidence. Specifically, plaintiff argues that the vocational expert testified that, based on plaintiff's testimony, there is no work in the national economy that plaintiff can perform; and the ALJ did not put forth a more restrictive hypothetical to which the vocational expert might have testified that there are jobs plaintiff can do. Plaintiff then presents cases which hold that a vocational expert's testimony is required in cases where a claimant suffers from a nonexertional impairment which includes vision impairments, and states that "[t]he Commissioner has the burden to demonstrate that there are jobs available in the national economy that realisticly [sic] suit the claimant's qualifications and capabilities."

■ Plaintiff's argument is misplaced. The cases holding that a vocational expert's testimony is required are dealing with findings at the fifth step of the sequential analysis where the Commissioner has the burden of proving that there are jobs the claimant can perform and where a finding has already been made that the claimant cannot return to past relevant work. That is not the case here. In this case, plaintiff was denied benefits at the fourth step where he maintained the burden of proving that he could not return to his past relevant work. The burden never shifted to the Commissioner. Testimony by a vocational expert is not required at the fourth step of the sequential analysis. *Gaddis v. Chater*, 76 F.3d 893, 896 (8th Cir. 1996); *Johnston v. Shalala*, 42 F.3d 448, 452 (8th Cir.1994).

■ In this case, the ALJ found that plaintiff had the residual functional capacity to perform light work. In determining a claimant's residual functional capacity, the ALJ is entitled to consider the following factors: the claimant's symptoms, subjective complaints that go beyond the symptoms, observations by others including family members and medical personnel, and the claimant's medical records. 20 C.F.R. § 404.1545(a).

Here, the ALJ had before him plaintiff's testimony that he missed 15 days of school per semester and missed school because of vessel ruptures, medical records indicating that plaintiff did not seek medical attention during January or February of 1995 but only visited the doctor on four occasions during the most recent semester, and medical records indicating that plaintiff had laser surgery only once during that previous semester. Because of these reasons (and the reasons discussed more fully in the section on plaintiff's credibility), I find that the ALJ's determination that plaintiff's subjective complaints were exaggerated is supported by substantial evidence and the ALJ was therefore entitled to discount plaintiff's subjective complaints in determining plaintiff's residual functional capacity.

The ALJ was also entitled to consider the testimony of plaintiff's mother which he did not find entirely credible as discussed above. The testimony of Mrs. Thurn was very brief and consisted essentially of "medical" testimony which was not corroborated by the medical records.

Finally, the ALJ was entitled to consider plaintiff's medical records which, as mentioned above, indicate that he visited the doctor a total of four times the previous semester. The ALJ also considered the fact that plaintiff lives by himself and makes passing grades as a full-time college student. Considering all of these factors, as mandated by 20 C.F.R. § 404.1545(a) and (c), the ALJ concluded that plaintiff's residual functional capacity did not prevent him from returning to his past relevant work as a cashier/clerk which is classified as "light duty" work.

For all of these reasons, I find that the ALJ's determination that plaintiff could return to his past relevant work as a cash-ier/clerk is supported by substantial evidence in the record.

## VIII. CONCLUSIONS

I sympathize with both plaintiff and his mother for having to endure a lifetime of calculating calories, carbohydrate grams, time and content of snacks, and having constantly to monitor plaintiff's blood sugar level. No doubt it is a very difficult regimen to follow. However, plaintiff's impairments simply do not rise to the level of "disability" as defined by the Act.

For the reasons stated above, I find that (1) the ALJ's determination that plaintiff's subjective complaints of disability were not credible is supported by substantial evidence, (2) the ALJ's determination that plaintiff's mother's testimony was not entirely credible is supported by substantial evidence, and (3) the ALJ's determination that plaintiff has the residual functional capacity to perform his past relevant work as a cashier/clerk is supported by substantial evidence. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.