**Russell L. GRIFFON, Appellant,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Appellee.**

**No. 87–2563.**

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1988.

Decided Sept. 14, 1988.

John W. Reid, II, Fredericktown, Mo., for appellant.

Wesley D. Wedemeyer, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before ARNOLD, Circuit Judge, FLOYD R. GIBSON and HENLEY, Senior Circuit Judges.

ARNOLD, Circuit Judge.

Russell Griffon appeals from the judgment of the District Court affirming the decision of the Secretary denying his claim for disability benefits. Because the denial of benefits was not supported by substantial evidence, we reverse.

---

## I.

At the time of this appeal, Griffon was a fifty-year-old man with a twelfth-grade education. He had been married to the same woman since 1961, and the couple had two minor children living at home. Griffon held his first job at the age of thirteen, when he worked as a carry-out boy at a supermarket. His most recent job was with Mississippi River Transmission Corporation, where he was a gas-pumping-station operator. Griffon worked at that position for twenty years, until August of 1983, when he began to suffer from the chest pain of which he now complains.

After suffering from chest pains during heavy exertion for two weeks, Griffon was admitted to the emergency room of his local hospital on August 5th when he began to experience pain even while at rest. Griffon, a one-to-two-pack a day smoker, told his doctors that he took medicine for hypertension. He also reported that his family had an extensive history of heart disease: both his parents, an aunt, two uncles, and a twenty-three-year-old cousin died from heart disease, and two of his siblings were currently receiving treatment for heart trouble. Testing revealed that one of Griffon's arteries, the left anterior descending vessel, was 60 to 70% blocked. All other cardiac tests were normal, including a stress or treadmill test. Griffon's doctor, Dr. Harshman, prescribed medication to control his angina, and advised him to return to normal activity gradually. Transcript at 80. Griffon was released from the hospital on August 12th.

Griffon was readmitted to the same hospital on August 28th, again complaining of chest pain. This time he experienced pain at rest which was only occasionally relieved by nitroglycerin. Once again, tests were performed. Dr. Harshman ruled out the possibility of a heart attack and told Griffon that there did not appear to be "a cardiac basis for his chest pain in view of the absence of electrocardiographic or physical examination changes during the chest pain." Tr. at 101.

Dissatisfied with Dr. Harshman's diagnosis, Griffon transferred to a different hospital on September 3rd to get a second opinion. There he came under the care of Dr. Talbert, a partner of his present cardiologist, Dr. Chapman. Dr. Talbert believed Griffon's complaints pointed toward coronary artery disease; however, routine tests failed to confirm this as the cause of the pain.[1]

Griffon was then transferred to a third hospital, where a Dr. Weiss performed transluminal coronary angioplasty on him. In this procedure a balloon is inserted into the patient's artery and then filled with air, with the effect of opening up a blocked or narrowed vessel. After the angioplasty, Griffon underwent another stress test. As before, he experienced some tightness in his chest, but achieved a normal heart rate. He was discharged in improved condition on September 27th.

On October 4th, Griffon was hospitalized yet again complaining of chest pain and was treated by Dr. Talbert. Griffon took a stress test, and again performed within normal limits, though he complained of pain. Indeed, Griffon claimed he felt pain in his chest even when walking the hospital halls. Tr. at 141. Further tests were run, which revealed 50% blockage of one artery, and 90% of another. This ischemia, or failure of the heart to receive sufficient oxygen, was noted by Dr. Talbert as a possible cause of Griffon's pain. *Id.* In addition, Dr. Talbert suggested the pain could be caused by mitral valve prolapse, a condition in which a valve bulges into the atrium. *Id.* Griffon was discharged October 13 with medication to treat his cardiovascular ailments and to relieve his anxiety.[2]

At a regular checkup with his cardiologist in November, Griffon was doing fairly well, though still complaining of some chest pain. On November 14, Dr. Talbert

1. Dr. Talbert investigated other, noncardiac, possible sources of Griffon's pain, such as back or stomach problems. Griffon was found to have some arthritis in his back, but nothing significant enough to be causing his chest pain.

2. On discharge, Dr. Talbert diagnosed Griffon as suffering from neurotic reactive depression, or depression as a result of his chest pain.

told Griffon he could return to work, but advised against any heavy lifting. In January of 1984, experiencing pain daily, during exertion and at rest, Griffon was instructed by his employer not to return to work. The company put him on its disability plan, and advised him to apply for social security disability benefits. Tr. at 203.

On February 23rd, Dr. Talbert diagnosed Griffon as falling within New York Heart Association functional class II [3] and told him not to engage in heavy work. Tr. at 188. Dr. Talbert hypothesized that Griffon's pain might be due to coronary artery disease of the microscopic-sized vessels, a variant of the disease difficult to detect by means of routine cardiac tests. Tr. 187. Griffon was hospitalized a few days later, on February 29th, with chest pains. Tests were run, but no new results were obtained, so he was released on March 2nd.

In a letter to Griffon's family physician, Dr. Ellegood, dated March 21, the cardiologist recited the February 23rd diagnosis and concluded that Griffon was "to remain permanently disabled on a partial basis for significant heavy workload for which he had been trained in the past." *Id.* He strengthened that admonition in a May 8th statement to the Secretary stating "patient cannot perform useful physical work because of stress-induced chest pain, probably angina, due to arteriosclerotic heart disease." Tr. at 201. Dr. Talbert summarized by stating that Griffon had been totally and permanently disabled under the social security laws since September 3, 1983. *Id.* Dr. Ellegood confirmed this conclusion in July of 1984, adding that Griffon had suffered a heart attack,[4] and that his condition was deteriorating. Tr. at 204.

## II.

Griffon had his first hearing before an ALJ on September 28, 1984. The ALJ de-

nied benefits, finding that though Griffon could no longer do moderate-to-heavy work, such as his old job required, he still retained the capacity for a full range of light work. He also found that the medical evidence described no non-exertional impairments. The District Court, acting on the recommendation of a magistrate, remanded the case for proper consideration of Griffon's subjective complaints of pain in light of the newly-decided *Polaski v. Heckler*, 739 F.2d 1320 (order), *supplemented*, 751 F.2d 943 (8th Cir.1984).[5]

Between the first and second disability hearings, Griffon's condition continued to deteriorate, and he was hospitalized five times. On October 11, 1985, he was admitted for six days and treated for congestive heart failure and unstable angina. That was when he began to be seen by his current cardiologist, Dr. Chapman. Griffon was hospitalized again on November 23rd for chest pain, and discharged December 2nd with the type and dosage of his medication increased. Later in December he was admitted yet again, with chest pain unrelieved by nitroglycerin, and a urinary tract infection. Griffon's next admission, on March 16, 1986, revealed continued blockage of two arteries, and a stress test showed a worsening of his condition. He was hospitalized for three days at the end of March as well.

Dr. Chapman, Griffon's treating physician since October of 1985, summarized the claimant's condition:

I evaluated Russell Griffon in the office again on May 27, 1986. He continues to have significant symptoms from his coronary artery disease and left ventricular dysfunction from his previous myocardial infarction. He is quite limited. At this point I consider him com-

---

**3.** Patients in this category have cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest, but ordinary activity may cause them chest pain.

**4.** The medical records are unclear as to whether and when Griffon suffered a heart attack. However, resolution of that question does not affect our holding.

**5.** Our decision in *Polaski* was subsequently vacated, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974, and adhered to on remand, 804 F.2d 456 (8th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987).

pletely disabled and unable to perform any type of regular occupation. Tr. at 301.

Griffon's second disability hearing was held on July 31, 1986. Griffon testified that his condition had worsened since he quit work. Tr. at 242. He said that on a typical day he cared for the family dog and might straighten up his tool shed. Walking the 25 yards from the house to the tool shed left him dizzy and nauseated, however. His doctor recommended Griffon walk one mile a day at his own pace. Griffon testified it took him two hours or more to complete the task, since he had to stop and rest frequently. Tr. at 254. An attempt to wash his car made him so sick he wound up in the hospital, and his doctor advised him not to try it again. Griffon complained that he has chest pains even at rest, and that his memory is getting worse. Griffon's wife confirmed this latter complaint, testifying that she does not like him to drive, because his reflexes have become so slow and his ability to concentrate so poor. Tr. at 264. Griffon noted that temperature extremes exacerbate his condition. He also observed that he gets upset more easily than he used to.

After hearing Griffon describe his ailments, the Secretary's vocational expert, in response to a question put to him by the ALJ, testified:

> [t]hat degree of symptomatology as far as I'm concerned is clearly incompatible with any form of competitive work, even of a sedentary nature. If he were referred to me by a treating physician with those symptoms, I certainly would not attempt to place him on a job. I would not feel that there would be any job that exists that he would have the stamina to perform.

Tr. at 273.

The ALJ found that Griffon had the capacity to perform ordinary sedentary work and thus was not entitled to receive benefits. In reaching this conclusion, the ALJ stressed that the objective medical evidence, as he interpreted it, revealed only "mild" cardiac disorders. He also emphasized the earlier opinions of doctors Talbert and Ellegood, which only disqualified Griffon from "heavy" or "physical" work. The ALJ made plain that he believed Griffon was a "cardiac cripple" by choice, due to his "morbid preoccupation with his family history of heart disease." With respect to the District Court's remand with directions to apply the *Polaski* test to Griffon's subjective complaints, the ALJ volunteered the opinion that this "Court has lately placed an inordinate emphasis on subjective and nonmedical factors. The definition of 'disability' always has been, and still is, essentially a medical definition." Tr. 229. Then without applying the *Polaski* standard for evaluating claims of pain, the ALJ refused to credit Griffon's complaints simply because they were unsupported by the objective medical evidence. *Id.*

The District Court affirmed the Secretary's decision, despite the benefit of an April 7, 1987, letter from Dr. Chapman in which the doctor stated that Griffon suffered from "significant coronary artery disease with disabling angina" and concluded that "Mr. Griffon is totally disabled, and I expect him to remain so indefinitely because of the nature of his disease." The letter also disclosed that Griffon had been treated with four angioplasties, one only a month before, and was scheduled to undergo coronary artery bypass surgery later in the week.

### III.

■ Judicial review of the Secretary's determination is limited; his decision must be upheld if there is substantial evidence on the whole record to support it. *Timmerman v. Weinberger*, 510 F.2d 439, 441 (8th Cir.1975). Review under this standard is not a rubber stamp for the ALJ, however. *McMillian v. Schweiker*, 697 F.2d 215, 220 (8th Cir.1983). In this case, as will be shown, there is not substantial evidence to support the ALJ's findings with respect to either Griffon's objective medical condition or his complaints of pain.

Once a social security disability claimant has shown a medically determinable impairment which prevents him from performing his former job, the burden of persuasion

**1154**

shifts to the Secretary to prove the claimant can do some other work in the national economy. *McMillian v. Schweiker, supra.* In this case, it is unchallenged that Griffon cannot return to his old job. The question then becomes whether the Secretary sustained his burden of proving Griffon can do some other work.

■ In concluding that Griffon could do sedentary work, the ALJ relied on his own independent evaluation of the medical evidence and on several early assessments of the claimant's condition by his former doctors. He gave no weight to the more recent statement by Griffon's current treating physician, a cardiologist who described the claimant as "quite limited" and "unable to perform any regular occupation." There was no medical evidence pointing to a contrary conclusion. By focusing on the evidence from the first hearing and overlooking or downplaying the more recent information, the ALJ came to a decision unsupported by the evidence considered as a whole.

Of even greater concern is the failure of the ALJ to apply the *Polaski* standards for evaluating pain after being specifically directed to do so by the District Court. The ALJ, in fact, did precisely what was forbidden in *Polaski:* he disregarded a claimant's subjective complaints solely because he believed the objective medical evidence did not support them. *Polaski,* 739 F.2d at 1322. Had the ALJ correctly considered Griffon's claims in light of *Polaski,* then, even given his skepticism about the existence of an objective medical impairment, the result of the hearing would have been different, and this appeal unnecessary. Griffon was a man who had held the same job for twenty years, until daily pain, pain that occurred first upon exertion and stress, later upon resting, eating, and even sleeping, caused him to quit that job. His description of his capabilities was confirmed by his wife and by his doctor. If the ALJ had doubts after the hearing that Griffon's pain was real or debilitating, they should have been dispelled by his review of the medical records. When the first cardiologist consulted failed to find the cause of his pain, Griffon sought a second opinion. When that doctor's original testing of him proved inconclusive, Griffon underwent further testing and treatment, including four painful angioplasties and major surgery, in order to find relief. The ALJ's conclusion that Griffon has chosen to become a cardiac cripple is belied by Griffon's relentless search for a solution to his pain. *Cf. Benskin v. Bowen,* 830 F.2d 878, 883 (8th Cir.1987). Griffon's subjective complaints were corroborated by the evidence offered by his wife, his treating physician, and his own continuing search for relief.

Thus, the Secretary's denial of benefits is not supported by the evidence. Griffon's doctor concluded that he was completely disabled due to a medically determinable impairment. No medical evidence was offered to dispute this. The vocational expert agreed that, if Griffon's complaints were real, he could not hold a job in the national economy. Griffon's complaints are corroborated by the medical evidence, and survive application of the *Polaski* standards for evaluating pain.

Accordingly, we reverse the judgment and remand this case to the District Court with directions to remand to the Secretary for an award of benefits in the appropriate amount.

It is so ordered.