Rose A. HIGH, [SSN: 497–66–2608], Plaintiff,

v.

Kenneth APFEL, Commissioner of Social Security, Defendant.

No. 97–1217–CV–W–BC–SSA.

United States District Court, W.D. Missouri, Western Division.

April 28, 1999.

David H. Bony, Kansas City, MO, for
Litigant Rose A. High, plaintiff.

Charles M. Thomas, U.S. Attorney's Office, Kansas City, MO, for John J. Callahan, Acting Commissioner of Social Security, defendant.

## *ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

LARSEN, United States Magistrate
Judge.

Plaintiff Rose A. High seeks review of
the final decision of the Commissioner denying plaintiff's applications for a period of
disability and disability insurance benefits
under Title II and Title XVI of the Social
Security Act ("the Act"), 42 U.S.C. § 401,
*et seq.;* 42 U.S.C. § 1382 *et seq.* Plaintiff
argues that the Administrative Law Judge
(ALJ) erred in finding that plaintiff is able
to perform a wide range of sedentary
work, in finding that plaintiff's testimony
was not credible, and in disregarding the
testimony of the vocational expert that
plaintiff is unable to perform sedentary
work. I find that the ALJ's determination
that plaintiff's subjective complaints of disability are not credible is not supported by
substantial evidence in the record as a
whole. I find further that, based upon the
testimony of the vocational expert and
plaintiff's credible statements concerning
her inability to stay awake during the day,
that there is no work which plaintiff is able
to perform and that she is disabled.
Therefore, plaintiff's motion for summary
judgment will be granted and the decision
of the Commissioner will be reversed.

## I. BACKGROUND

On September 20, 1995, plaintiff applied
for a period of disability and disability
insurance benefits under Title II and for
supplemental security income benefits
based on disability under Title XVI, alleging that she had been disabled since October 3, 1994. Plaintiff's applications were
denied initially and upon reconsideration.
On October 24, 1996, a hearing was held
before an ALJ. On December 23, 1996, the
ALJ found that plaintiff was not under a
"disability." Plaintiff requested a review
of that hearing decision by the Appeals
Council. On July 1, 1997, the Appeals
Council denied plaintiff's request for review. Therefore, the decision of the ALJ
stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

■ Section 205(g) of the Act, 42 U.S.C.
§ 405(g), provides for judicial review of a
"final decision" of the Commissioner under
Title II. Section 1631(c)(3) of the Act, 42
U.S.C. § 1383(c)(3), provides for judicial
review to the same extent as the Commissioner's determination under section
405(g). The standard for judicial review
by the federal district court is whether the
decision of the Commissioner was supported by substantial evidence. 42 U.S.C.
§ 405(g); *Richardson v. Perales,* 402 U.S.
389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842
(1971); *Johnson v. Chater,* 108 F.3d 178,
179 (8th Cir.1997); *Andler v. Chater,* 100
F.3d 1389, 1392 (8th Cir.1996). The determination of whether the Commissioner's
decision is supported by substantial evidence requires review of the entire record,
considering the evidence in support of and
in opposition to the Commissioner's decision. *Universal Camera Corp. v. NLRB,*
340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed.
456 (1951); *Thomas v. Sullivan,* 876 F.2d
666, 669 (8th Cir.1989). "The Court must
also take into consideration the weight of
the evidence in the record and apply a
balancing test to evidence which is contra-

dictory." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987) (citing *Steadman v. Securities & Exchange Commission*, 450 U.S. 91, 99, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401, 91 S.Ct. 1420; *Jernigan v. Sullivan*, 948 F.2d 1070, 1073 n. 5 (8th Cir.1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposition decision." *Id.; See also Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir.1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. *Griffon v. Bowen*, 856 F.2d 1150, 1153–54 (8th Cir. 1988); *McMillian v. Schweiker*, 697 F.2d 215, 220–21 (8th Cir.1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, *et seq.*, 416.901, *et seq.* The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. §§ 404.1520, 416.920, and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

Yes = not disabled.

No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

No = not disabled.

Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.

No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.

Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

Yes = disabled.

No = not disabled.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.

No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.

Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

Yes = disabled.

No = not disabled.

### IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Michael E.

Russell, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### 1. EARNINGS RECORD

Plaintiff's earnings record shows that she earned the following income from 1979 until 1994:

| | |
|---|---|
| 1979 | 2341.73 |
| 1980 | 7823.41 |
| 1981 | 8780.48 |
| 1982 | 10286.45 |
| 1983 | 10960.13 |
| 1984 | 10596.17 |
| 1985 | 11526.69 |
| 1986 | 11490.98 |
| 1987 | 16649.50 |
| 1988 | 12421.62 |
| 1989 | 1286.39 |
| 1990 | 4233.92 |
| 1991 | 6754.05 |
| 1992 | 0.00 |
| 1993 | 1812.50 |
| 1994 | 12274.82 |

(Tr. at 63).

### 2. VOCATIONAL REPORT

Plaintiff indicated on her vocational report that she worked for the following employers:

07/79 to 05/84 Insurance company (operator), 5 days per week

07/84 to 06/88 Hardware store (advertising ass't), 5 days per week

10/88 to 01/89 Mail order (customer service), 5 days per week

03/90 to 05/94 Pipe organ builder (floater), 3–5 days per week

04/91 to 04/92 Law firm (legal secretary), 3–5 days per week

08/92 to 07/93 Video store (business owner), 6 days per week

05/94 to 10/94 Printer (machine operator), 5 days per week

(Tr. at 64)[1].

As a machine operator, plaintiff operated a bindery machine (Tr. at 65). During a typical day, she was required to walk 1 hour, stand 7 hours and bend frequently (Tr. at 65). She frequently lifted up to 50 pounds (Tr. at 65).

Plaintiff owned and operated the video store (Tr. at 68). During a typical day, she was required to sit for 4 hours and occasionally bend (Tr. at 68). She frequently lifted up to 10 pounds and sometimes lifted 50 pounds (Tr. at 68).

At the pipe organ company, plaintiff worked in all areas of building pipe organs, including operation of power tools (Tr. at 66). During a typical day, she was required to walk 1 hour, stand 5 hours and occasionally bend (Tr. at 66). She frequently lifted up to 25 pounds and sometimes lifted over 100 pounds (Tr. at 66).

As a legal secretary, plaintiff prepared court documents, paid bills, answered the telephone (Tr. at 67). During a typical day, she was required to walk 1 hour, stand 1 hour, sit 7 hours and bend occasionally (Tr. at 67). She frequently lifted up to 10 pounds and sometimes lifted 20 pounds (Tr. at 67).

### 3. DISABILITY REPORT

On her Disability Report completed September 12, 1995, plaintiff wrote the following:

Her disabling condition is fibromyalgia, pain in her muscles, extreme fatigue, depression, headaches, memory problems, stiffness (Tr. at 75). Her condition first bothered her on June 3, 1994, and finally made her stop working on October 3, 1994 (Tr. at 76). After being shocked in June, her condition slowly worsened, she became extremely fatigued, experienced pain and swelling in her legs, weakness in her upper

---

**1.** On the Vocational Report, plaintiff wrote that she worked for the pipe organ builder from 03/90 to 05/95. She testified at the hearing that she left this job in 1994. Similarly, her job at the printing company was in 1994 rather than 1995 as she wrote on the Report.

body, started having migraines, depression, stiffness and backaches (Tr. at 76).

Her condition keeps her from working because of her extreme fatigue and pain, her depression and stiffness, because she is unable to stand or sit for very long, because she has no strength in her arms to lift (Tr. at 76).

She has been treated by Dr. Aaron Travis for fibromyalgia and ulcers, by Dr. Eric Peters for fibromyalgia, by Lizbeth Sussman for headaches, and at Cass Medical Center for headache and vomiting (Tr. at 78).

Dr. Travis and Dr. Peters have told her not to work and to do activities as tolerated (Tr. at 79).

She shops once a week, loads her dishwasher and occasionally dusts, cooks the evening meals and does laundry (Tr. at 79). She has no recreational activities, except some crafts which she does every two or three weeks as tolerated (Tr. at 79). She drives occasionally (Tr. at 79).

#### 4. THIRD PARTY QUESTIONNAIRE

Plaintiff's sister, Betty Sue Mack, completed a Third Party Questionnaire on October 4, 1995, on which she reported that her sister had gone from being a very energetic, vibrant person to one who could hardly do her own dishes (Tr. at 88). She reported that her sister complains of hurting and aching all the time and sleeps and cries a lot (Tr. at 88).

#### 5. RECONSIDERATION DISABILITY REPORT

On her Reconsideration disability Report completed on January 22, 1996, plaintiff wrote the following:

With cold weather her arms and legs have been hurting more than during the warmer months and she is more fatigued (Tr. at 70). she caught a cold that lasted almost three months because her immune system is not what it used to be (Tr. at 70).

Since the cold weather, she has been unable to get out and has had to take pain medication (Tr. at 70). Some days she stays in bed all day (Tr. at 70).

She is unable to shower and dry her hair like she used to (Tr. at 72). She is unable to wear her contact lenses because she falls asleep so easily (Tr. at 72). She is unable to cook as much as she used to and has to slide dishes along the counter because she isn't always able to pick them up (Tr. at 72).

#### 6. CLAIMANT'S STATEMENT WHEN REQUEST FOR HEARING IS FILED

On an undated Claimant's Statement When Request for Hearing is Filed, plaintiff reported the following:

She has tingling in her arms and legs and is dizzy and lightheaded (Tr. at 86). She has frequent diarrhea (Tr. at 86). She has been sleeping more (Tr. at 86).

She is taking DayPro 600 mg. twice a day, Cytotec 200 mg. twice a day, Estratest once a day, and Tylenol as needed (Tr. at 87).

#### 7. CLAIMANT'S MEDICATIONS

On a Claimant Medication form dated October 20, 1996, plaintiff wrote that she was taking Naprelan (an anti-inflammatory), Cytotec (for her ulcers), Premarin (estrogen therapy), Zoloft (an anti-depressant), Skelaxin (for sleep), Doxepin (for sleep), Darvocet (as needed for headaches and pain), and Tylenol (for pain and headaches) (Tr. at 152).

### B. SUMMARY OF MEDICAL RECORDS

On October 2, 1994, plaintiff reported to the Cass Medical Center Emergency Room with complaints of severe headache and vomiting (Tr. at 91). She was diagnosed with carbon monoxide poisoning, released, and instructed to check her furnace and car exhaust and not to smoke (Tr. at 91).

On October 3, 1994, plaintiff returned to the Cass Medical Center Emergency Room with persistent headache (Tr. at 93). An MRI was within normal limits (Tr. at 95). She was prescribed Darvocet and released (Tr. at 93).

Plaintiff was seen by Damon Travis, D.O., on October 6, 1994, for a follow-up of elevated carbon monoxide levels (Tr. at 124)[2]. On October 11, she saw Aaron Travis, D.O., complaining of headache and when she called on October 14, reporting that her headaches were persisting, Dr. Travis referred her to Lizbeth Sussman, M.D., for a neurological examination (Tr. at 124).

Dr. Sussman thought plaintiff might have spinal meningitis based upon plaintiff's report of fever on and off for the past three weeks and because plaintiff had reported generalized aches and pains (Tr. at 131). Dr. Sussman, after interviewing plaintiff in detail about her possible exposure to carbon monoxide, was unable to identify a source, and so was reluctant to ascribe her symptoms to carbon monoxide poisoning (Tr. at 131). Dr. Sussman scheduled a lumbar puncture for the next day (Tr. at 131).

The lumbar puncture results were normal (Tr. at 132). On October 27, 1994, Dr. Sussman wrote to Dr. Damon Travis that plaintiff was still experiencing headaches which were not relieved by Darvocet (Tr. at 132). Plaintiff had reported to Dr. Sussman that she was extremely fatigued and could not even go to the store without feeling "wiped out" (Tr. at 132). Examination of the plaintiff on this date revealed mild to moderate spasm of the cervical paraspinals bilaterally and the trapezii as well (Tr. at 132). Dr. Sussman now thought plaintiff might be suffering subacute systemic viral illness (Tr. at 132). Dr. Sussman did testing for Epstein–Barr virus, Lyme disease, histoplasmosis, HIV and hepatitis (Tr. at 133), the results of

which were negative. Lorcet Plus was prescribed for plaintiff's headaches and Paxil, both because plaintiff had complained of depression and because this medication had been used to treat fatigue and chronic fatigue syndrome (Tr. at 133). Dr. Sussman prescribed Fiorinal the next week and told plaintiff to use the Lorcet only if her headaches were particularly bad (Tr. at 134).

Plaintiff was seen on November 16 and November 30, 1994, by Eric Peters, M.D., a rheumatologist (Tr. at 128). He reported to Dr. Damon Travis that plaintiff's physical exam was relatively unremarkable, that she had a few fibromyalgia trigger points, but no active synovitis (Tr. at 128). He thought that her symptoms most resembled fibromyalgia (Tr. at 128). Plaintiff had reported to Dr. Peters that she thought her symptoms started after an electrical shock at work, but Dr. Peters reported to Dr. Travis that he knew of no good studies that showed either trauma or electric shock can cause fibromyalgia (Tr. at 128).

Dr. Peters started plaintiff on Relafen and he reported to Dr. Travis that plaintiff had relatively good improvement with that; he subsequently started her on Ambien in hopes that it would improve her sleep (Tr. at 128).

On December 19, 1994, plaintiff reported to Dr. Aaron Travis that she was feeling "some better" but was still fatigued throughout the day (Tr. at 125). She reported minimal muscle aches (Tr. at 125). Dr. Travis discontinued Paxil and started plaintiff on Pamelor (Tr. at 125).

On January 3, 1995, plaintiff reported to Dr. Aaron Travis that she had been to the fibromyalgia clinic at St. Joseph's Hospital and was feeling "positive" (Tr. at 125). Dr. Travis prescribed Flexeril to help sleep pattern and plaintiff was to start an exercise program doing three minutes of

---

**2.** Damon Travis and Aaron Travis are affiliated in Harrisonville Family Medicine, Inc. Both have treated plaintiff.

aerobic exercise every other day (Tr. at 125).

On January 12, 1995, plaintiff reported to Dr. Aaron Travis that the Flexeril was helping with the pain but that she was still tired all the time (Tr. at 125). Dr. Travis continued her on Flexeril and also started her on Elavil at night (Tr. at 125).

On January 20, 1995, plaintiff reported headaches from the Elavil (Tr. at 126). She was put back on Paxil (Tr. at 126).

On February 14, 1995, plaintiff reported to Dr. Aaron Travis that she was doing better, exercising twice a day and resting as needed (Tr. at 126). She reported she still had pain in her elbows and knees (Tr. at 126). Plaintiff was told to increase her activity as tolerated (Tr. at 126).

On March 7, 1995, plaintiff reported that her stomach was burning (Tr. at 126). Dr. Travis thought this was due to gastritis secondary to nonsteroidal medications (Tr. at 126). Plaintiff was instructed to split her dose of Relafen and take Mylanta with it (Tr. at 126). When stomach problems continued, Dr. Travis ordered an esophagogastroduodenoscopy which revealed severe duodenitis with duodenal ulcerations, hiatal hernia and superficial gastric ulceration (Tr. at 117). Dr. Travis discontinued Relafen, plaintiff was to use Darvocet as needed for pain, and she was to be placed on high dose H2 blockers (Tr. at 117).

On November 1, 1995, plaintiff was evaluated at the request of Disability Determinations by M.A. Medhat, M.D. (Tr. at 121–22). Plaintiff reported that she was then taking Paxil, Zantac, Ibuprofen, Lorcet, Ambien, Flexeril and Relafen, when she is not taking Ibuprofen (Tr. at 121). Dr. Medhat reported that his findings were "mainly symptomatic," that he found no localized trigger points on his examination, no limitation in range of motion or use of extremities (Tr. at 122).

On December 9, 1995, plaintiff was seen in the Emergency Room at Cass Medical Center (Tr. at 119–20). She complained of pain in her right shoulder, right elbow and right knee that had been increasing since the day previous (Tr. at 120). The emergency room physician noted that while in the Emergency Room, plaintiff did not appear to be in acute pain, but appeared to be depressed (Tr. at 120). Examination of the extremities did not show any swelling or redness of the joint; motion of the shoulder was not associated with pain; neither the right arm nor the right lower extremity showed any tenderness on palpitation (Tr. at 120). She was given a Toradol injection, Demerol and Vistaril, without any pain relief (Tr. at 120).

On July 15, 1996, Dr. Aaron Travis wrote a "To whom it may concern letter," in which he reported the following about plaintiff's medical condition:

> She has curious diagnosis [sic] of fibromyalgia, chronic headaches, fatigue and estrogen deficiency. She has multiple problems including significant fatigue, muscle and joint aches and intermittent monarticular arthritis. She is unable to tolerate prolonged activity and does well to maintain her household. she still relies a significant amount on her children and husband for these activities. Depression is also a component of this process, although it seems to be controlled at this time. Her functional status is significantly diminished but stable at this time.

(Tr. at 139).

On August 2, 1996, plaintiff was examined by Frederick Wolfe, M.D., at the University of Kansas School of Medicine, apparently at the request of a former employer. (Tr. at 140–41). Dr. Wolfe reported that he evaluated plaintiff using the Stanford health assessment questionnaire (Tr. at 140). Plaintiff reported impairment in every area of daily living (Tr. at 140). She reported pain levels of 2.2 on a 3.0 scale, fatigue at 2.6 on a 3.0 scale, sleep disturbance at 2.6 on a 3.0 scale, global severity of 2.0 on a 3.0 scale. Her depression score was in the area of clinical depression (Tr. at 140).

On examination, Dr. Wolfe found plaintiff's right ankle to be tender on rotation and both wrists to be tender on movement (Tr. at 141). There was no evidence of swelling (Tr. at 141). Plaintiff had tender points positive in 18 of 18 tender point regions and in 5 of the 6 control regions (Tr. at 141). Dr. Wolfe concluded that plaintiff fulfilled the criteria for fibromyalgia and had the characteristic symptoms for the disease (Tr. at 141).

On August 9, 1996, plaintiff was seen by Nabih Abdou, M.D., at the Center for Rheumatic Disease, on referral from Dr. Aaron Travis (Tr. at 150–51). Dr. Abdou concluded that plaintiff had a classical case of fibromyalgia syndrome with fatigue and depression (Tr. at 150). His physical examination was essentially negative or normal except for very tender trigger points (Tr. at 151). Plaintiff reported that she was then taking Zoloft, Premarin, calcium and Ultram (Tr. at 150). Dr. Abdou prescribed DayPro, Skelaxin and Doxepin (Tr. at 151). He instructed her to exercise by walking 20 minutes three times a week and encouraged her to attend a coping class and support group for fibromyalgia (Tr. at 151).

## C. SUMMARY OF TESTIMONY

During the hearing, plaintiff testified, and a vocational expert, Michael E. Russell, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

Plaintiff testified that at the time of the hearing, she was 38 years old (Tr. at 160). She lives with her husband and two children, ages ten and eleven, in a duplex apartment (Tr. at 159). Her husband is employed (Tr. at 160).

Plaintiff has gained about 20 pounds in the past year because she is more inactive than she used to be (Tr. at 160).

Plaintiff graduated from high school, took a couple of college classes and has a license as an emergency medical technician (Tr. at 160). She has never worked as an emergency medical technician (Tr. at 161).

Plaintiff last worked as a machine operator at Deluxe Printing in October 1994 (Tr. at 161). She received an electrical shock from a machine there which she believes is what led to her present condition of fibromyalgia (Tr. at 161–62). She has never received Workers' Compensation for this injury although she filed a claim (Tr. at 161). Plaintiff's family doctor, Dr. Travis, has never released her to go back to work (Tr. at 161–62).

Before working at Deluxe Printing, plaintiff worked at Miller (Tr. at 162). She left that job to go to work at Deluxe, which was a better job (Tr. at 162).

Before that she worked for one year as a legal secretary (Tr. at 162). She left that job because it was very stressful (Tr. at 163).

Prior to that, plaintiff and her husband owned their own business, Rosie's Arcade and Video (Tr. at 163).

Plaintiff is unable to work now because of stiffness in the mornings (Tr. at 163). She is unable to even hold her cup of coffee (Tr. at 163). This stiffness sometimes lasts only about an hour, sometimes almost all day (Tr. at 163). It kind of depends on the weather (Tr. at 163). The stiffness is in her arms, legs, hips, back and hands (Tr. at 163).

Plaintiff also tires very easily, has headaches, problems with diarrhea (Tr. at 163). Her headaches never really go away, although sometimes they are worse than at other times (Tr. at 163). Maybe every couple of weeks she has really bad headaches (Tr. at 163). She has diarrhea two or three times a week; sometimes it keeps her up all night (Tr. at 164).

At the time of the hearing plaintiff was taking Naprelan, an anti-inflammatory, Darvocet and Tylenol (Tr. at 164). She takes Darvocet as needed, and last took it a week before the hearing (Tr. at 164). Plaintiff takes Pepto Bismol for her diarrhea, but says it is related to her medi-

cation and her fibromyalgia and the Pepto Bismol doesn't help much (Tr. at 165). Plaintiff does not have her headaches as bad since she began taking Naprelan (Tr. at 166). Plaintiff is sometimes very drowsy and groggy, but she does not know if this is caused by her medication (Tr. at 166).

Plaintiff's shoulders and upper back are the most painful (Tr. at 166).

Plaintiff's pain is made worse by the cold and by doing more than she is supposed to (Tr. at 167). Plaintiff rates her pain about 6, sometimes 7, on a scale of 1 to 10 (Tr. at 167). It is sometimes worse (Tr. at 167).

Sometimes if she isn't feeling as bad, she will do something such as try to clean house, go for a walk, play with her kids, and these activities sometimes make her feel worse because she has done too much (Tr. at 167).

Plaintiff does the exercises her doctor has given her and walks every day (Tr. at 168). Her doctor has told her to walk about 20 minutes at least every other day (Tr. at 168). Plaintiff walks until she gets tired (Tr. at 168). Plaintiff has difficulty sitting and cannot usually sit for two hours before she has to get up (Tr. at 168).

Plaintiff's legs hurt if she stands for too long (Tr. at 168). If she is making French toast she has to sit down and stand up (Tr. at 168–69).

Plaintiff is able to do her grocery shopping, but the sacker carries the bags to her car and someone helps unload them at home, although she is able to lift light bags (Tr. at 169). She doesn't buy anything heavier than a ten pound bag of potatoes (Tr. at 169).

Plaintiff reads to keep busy (Tr. at 169). She used to read nonfiction, but has difficulty reading nonfiction now because she can't remember what she read (Tr. at 169). She tries to do some crafts and sewing, but she is unable to do that for very long because her hands start bothering her (Tr. at 169). She can drive her car, but it hurts

to sit and drive for very long (Tr. at 170). She visits people and they stop by to see her (Tr. at 170).

Plaintiff goes to her children's school activities and takes them to the doctor and dentist (Tr. at 170). She is no longer able to go on field trips with them (Tr. at 170).

Plaintiff does laundry (Tr. at 170). She cooks, but usually only in the evening when her husband is there if she needs help (Tr. at 170). She can't pick up heavy pans (Tr. at 170–71).

Plaintiff is able to take care of her own personal needs, but is unable to curl her hair as she used to do because she is unable to hold her hands over her head for very long (Tr. at 171). Sometimes she is unable to stand up long enough to finish her shower and has to turn the water off, sit down and rest for a while (Tr. at 171). When she blow dries her hair, she sits on a stool and props her arms on her legs (Tr. at 171).

Plaintiff smokes (Tr. at 165).

Plaintiff and her family go to a family therapist every two weeks (Tr. at 171). This sometimes help plaintiff deal with her own problems (Tr. at 171).

Plaintiff has lived in her present home one and a half years (Tr. at 172). Before, that they lived in a two story home with the laundry in the basement and the bedrooms upstairs (Tr. at 172). They had to move because she was unable to take care of the large house anymore and they were unable to afford it any longer because she was not working (Tr. at 172–73).

If plaintiff sits for very long, she falls asleep (Tr. at 172).

Plaintiff is unable to sleep at night because her arms hurt and her legs tighten up (Tr. at 173). The most she sleeps without interruption is three hours if she doesn't take pain medication (Tr. at 43). She does not like to take pain medication because it makes her feel hung over in the morning (Tr. at 173).

About three weeks prior to the hearing her former employer, for whom she worked as a legal secretary, asked to come in because he needed some help on a court case; for two days she sat in the courtroom in case he needed some copies made or something (Tr. at 174–75). She has not felt well since then (Tr. at 175). She has a computer at home, but she is only able to type for about 20 minutes before her hands, arms and shoulders start to bother her (Tr. at 175).

Plaintiff sometimes lies down and sleeps two or three times a day (Tr. at 181). She can't tell from day to day how it will be—some days she will be able to stay up all day, then other days she falls to sleep right after the kids leave for school (Tr. at 182). Sometimes she will learn after the fact that people have come by and rung the doorbell or telephoned, but she won't have known it because she slept through it (Tr. at 182).

Plaintiff's husband drove her to the hearing (Tr. at 175).

## 2. Vocational expert testimony.

Vocational expert Michael E. Russell testified at the request of the ALJ. The vocational expert summarized plaintiff's past work: as bindery machine operator at a light semiskilled level; as a legal secretary at a sedentary and semiskilled level; as a video store owner at a light and semiskilled level; as a customer service representative, mail order, at a sedentary and semiskilled level; as an advertising assistant at a sedentary and semiskilled level; and as a telephone operator and receptionist at a sedentary semiskilled level (Tr. at 178). Only the video store owner position would have a sit/stand option (Tr. at 178).

The ALJ posed the following hypothetical: is a woman 38 years of age, with similar education and work experience as claimant; with the residual functional capacity for sit/stand option; has concentration problems that would limit her to simple repetitive tasks; because of mild to moderate body aches in upper back, hips, arms and shoulders would be limited in bending, pushing and pulling and reaching overhead (Tr. at 179). The vocational expert testified that such an individual would be able to perform the work of security systems monitor, of which there are 1495 in the metropolitan area and 4380 in the state of Missouri; an electronics assembler, of which there are 1440 in the metropolitan area and 2730 in the state of Missouri; and telephone solicitor, of which there are 1380 in the metropolitan area and 1960 in the state of Missouri (Tr. at 180).

The ALJ modified the hypothetical to add that the individual had a headache of mild to moderate severity, lessened by medication, once every two weeks (Tr. at 180). The vocational expert testified that this would not interfere with the jobs previously mentioned (Tr. at 180).

Plaintiff's attorney then modified the hypothetical to add that the individual would fall asleep after three hours of sitting (Tr. at 180). The vocational expert testified that such an individual could not be gainfully employed (Tr. at 180).

Plaintiff's attorney then modified the hypothetical further to provide that the individual required a nap at some point during the day (Tr. at 182). The vocational expert testified that if the nap could be scheduled in the normal routine of an 8-hour day during allowed breaks, it would not preclude employment, but unscheduled, unpredictable naps would preclude employment (Tr. at 182–83).

## D. FINDINGS OF THE ALJ

In determining that plaintiff was not entitled to disability or supplemental security income benefits, the ALJ found that plaintiff had fibromyalgia and depression, but that she did not have an impairment or combination of impairments listed in or equal to a listed impairment. The ALJ found that plaintiff was limited in that she is unable to lift more than ten pounds or

repetitively bend, push, pull and reach overhead, must alternate sitting and standing, and is limited to simple repetitive tasks.

The ALJ found that these limitations did not preclude plaintiff's returning to her past relevant work as a legal secretary.

The ALJ found that these limitations did not preclude plaintiff's performing other work such as security system monitor, information clerk, electronics assembler or telephone solicitor.

In reaching this conclusion, the ALJ found plaintiff's testimony concerning subjective complaints not credible.

## V. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ did not properly evaluate plaintiff's testimony in reaching her conclusion concerning plaintiff's credibility.

### A. CONSIDERATION OF RELEVANT FACTORS

■ The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. *Benskin v. Bowen,* 830 F.2d 878, 882 (8th Cir.1987). In reviewing an ALJ's determination of credibility, the first question a federal court is to consider is whether the ALJ considered all evidence relevant to plaintiff's subjective complaints. *Id.* The absence of an objective medical basis which supports the degree of severity of subjective complaints is one factor to be considered, but the ALJ must also consider "prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions." *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984). After the court has determined whether the ALJ has considered all the evidence relevant to plaintiff's subjec-

tive complaints, the court must ask whether that evidence contradicted plaintiff's account, so that the ALJ could discount plaintiff's testimony for lack of credibility. *Benskin v. Bowen,* 830 F.2d at 882. If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. *McClees v. Shalala,* 2 F.3d 301, 303 (8th Cir.1993); *Polaski v. Heckler,* 739 F.2d at 1322. The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. *Hall v. Chater,* 62 F.3d 220, 223 (8th Cir.1995); *Robinson v. Sullivan,* 956 F.2d 836, 839 (8th Cir.1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. *Robinson v. Sullivan,* 956 F.2d at 841.

### 1. PRIOR WORK RECORD

■ The ALJ stated with respect to plaintiff's work record that it is "not particularly helpful on the issue of credibility," noting that her earnings were good through 1988 and again in 1994, but modest from 1989 to 1993 (Tr. at 14). I agree with the ALJ that plaintiff's work record does not weigh either against or in favor of her credibility.

### 2. DAILY ACTIVITIES

Although the ALJ stated that plaintiff's activities were inconsistent with her alleged complaints,* the only activities the ALJ discussed in this context were plaintiff's work activities, stating in her decision:

Although the claimant insisted that she did not work after October 1994, there were posted wages for 1995. She offered no explanation of those earnings. Furthermore, she attempted to work less than one month prior to the hearing. These activities indicate that the

claimant felt a level of vigor and stamina inconsistent with her alleged disability. (Tr. at 14).

I will consider each of these "activities":

**Posted earnings for 1995:** Plaintiff's "Summary FICA Earnings" report indicates earnings of $4633.42 for 1995. Additionally, when plaintiff completed the Claimant's Work Background form at the time of the hearing, she wrote that she had left her job at the Miller Organ Company in May 1995 and her job at Deluxe Check Printers in October 1995.

At the hearing, the ALJ asked plaintiff about the dates on the Claimant Work Background form and plaintiff stated that she last worked in October 1994. The ALJ told plaintiff's attorney that plaintiff would need to correct the form (Tr. at 28, 158) and, in fact, the 1995 dates have been written over and changed to 1994 (Tr. at 153). The ALJ did not press plaintiff on this point, except to ask at a later point in the hearing:

Q. Now, I'm looking at your employment record. You last worked October of '94. Is that correct?

A. Yes.

(Tr. at 161).

At no time during the hearing did the ALJ point out to plaintiff that she had FICA earnings posted for 1995 or ask her to account for this discrepancy. Having neglected to seek clarification at the hearing, I assume that the Social Security Administration has the wherewithal to ascertain at any time to whom these earnings should properly have been posted, whether plaintiff or someone else. Having failed to so do, the ALJ may not now impugn plaintiff's credibility by contending that she has been employed during her claimed period of disability. *See Cookemboo v. Apfel*, 983 F.Supp. 1274, 1278 (E.D.Mo.1997).

In her decision, the ALJ made an express finding of fact that plaintiff had not engaged in substantial gainful activity since October 3, 1994 (Tr. at 15). I conclude that the ALJ satisfied herself that the earnings posted to plaintiff's account were not, in fact, plaintiff's.

**Plaintiff's attempt to work:** The ALJ stated that plaintiff attempted to work less than one month prior to the hearing and that this activity indicates that plaintiff felt a level of vigor and stamina inconsistent with her alleged disability.

During the period April 1991 to April 1992, plaintiff worked as a legal secretary. She states she left this job because it was too stressful.

Plaintiff testified that about three weeks prior to the hearing she was approached by her former employer, who told her he needed some help with a court case. The following is plaintiff's testimony about this brief employment:

And so I went down there for two days. And all I did was sit in the court and just be there in case he needed something, like copies made or something. And I really haven't felt good since then. I was only down there two days. And I didn't type, I didn't do anything but make copies. And just looked through the file. I didn't do really, you know, anything like I used to when I was his secretary.

(Tr. at 175).

How one gets from this statement to a conclusion that plaintiff "felt a level of vigor and stamina inconsistent with her alleged disability" is quite beyond me. Plaintiff worked for two days, basically sitting in a courtroom, and she has not recovered from the exertion three weeks later. Unless we are to say that any attempt to work whatsoever disqualifies an individual for benefits, and such is not the case, I am unable to conclude that this activity can reasonable be found inconsistent with plaintiff's subjective complaints.

The ALJ has made no other express credibility finding with respect to any of plaintiff's daily activities. I have reviewed the record in this regard and find that

plaintiff's daily activities are not inconsistent with her subjective complaints.

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

The ALJ made no express credibility finding as to this factor.

Plaintiff's sister, Betty Sue Mack, completed a Third Party Questionnaire in which she wrote that plaintiff had no energy, was unable to walk for long or shop, that she slept a lot more, was hardly able to do her own dishes or vacuum without crying and hurting, that plaintiff "can't seem to make her body work to be able to go anywhere or do anything like she used to."

This statement is consistent with plaintiff's allegations of subjective complaints.

### 4. PRECIPITATING AND AGGRAVATING FACTORS

The ALJ made no express credibility findings as to this factor.

Plaintiff testified that her symptoms become worse if she tries to do too much. Cold weather makes her symptoms worse. Standing or sitting for very long aggravates her symptoms.

I do not find that this factor supports or discredits plaintiff's subjective complaints.

### 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

The ALJ stated in her decision:

The claimant does take prescription medications. At the hearing she testified that her medication caused drowsiness and grogginess. However, her pain medications were prescribed shortly before the hearing. All of the claimant's medications were prescribed within four months of the hearing. There is no evidence that any have been used consistently since her initial diagnosis. In addition, the claimant admitted that she also uses Tylenol for pain relief. Use of over-the-counter pain reliever is inconsistent with allegations of completely debilitating discomfort. *Nelson v. Sullivan*, 946 F.2d 1314, 1317 (8th Cir.1991). (Tr. at 14).

The ALJ's statements concerning plaintiff's medications are largely incorrect. It is true that the pain medications listed on the Claimant's Medications form completed at the time of the hearing had been prescribed shortly before the hearing, but that form asks only for the medications the claimant is "presently taking." A review of the entire record reveals that, during the course of her illness, plaintiff had also been prescribed the following medications for pain relief: Toradol, Lorcet Plus, Fiorinal, Flexeril and Relafen. Darvocet had also been prescribed as early as 1995, although plaintiff apparently received a new prescription in October 1996.

The ALJ's statement that all of the claimant's medications were prescribed within four months of the hearing is totally unsupported by the record, which shows not only the above pain medications, but additional medications for insomnia, fatigue, gastritis and depression have been prescribed throughout the course of plaintiff's illness.

The ALJ states there is no evidence that any of plaintiff's medications have been used consistently since her initial diagnosis. This statement is true. The medical record indicates that plaintiff's physicians have struggled to find medications and combinations of medications that would effectively treat plaintiff's set of symptoms while minimizing undesirable side effects. In the annals of medicine, these facts are not unusual, and I do not see how we may draw from them any conclusions whatsoever bearing upon plaintiff's credibility.

Finally, the ALJ states that plaintiff has *admitted* that she uses Tylenol for pain relief and that such use is inconsistent with allegations of completely debilitating discomfort. This is not the law in the Eighth

Circuit. In the case cited by the ALJ, *Nelson v. Sullivan,* one of the several factors considered by the court, in deciding that the claimant was no longer disabled, was the fact that his physician had prescribed no pain reliever stronger than aspirin. 946 F.2d at 1317. The use of over-the-counter pain reliever, in and of itself, says little. Even if a claimant takes nothing but over-the-counter medications for his or her pain, no credibility conclusion may properly be drawn without consideration of the frequency, dosage and side effects of the medication. *Hall v. Chater,* 62 F.3d 220, 223 (8th Cir.1995). In this case, plaintiff was, at the time of the hearing, taking 1000 to 2000 mg. of Tylenol per day, in addition to her other medications for pain. This does not reflect adversely upon her credibility in any way.

### 6. FUNCTIONAL RESTRICTIONS

The ALJ states:

> Although the claimant alleged that her physician and therapist told her that she could not work and her activities were as tolerated, there is no evidence of physician-imposed functional limitations in the documentary record.

(Tr. at 14).

I note that plaintiff submitted to the Appeals Council a Certification of Health Care Provider (provided pursuant to the Family and Medical Leave Act of 1993), signed by Dr. Aaron Travis, on which Dr. Travis indicated that as of December 1994 and continuing indefinitely, plaintiff had a chronic condition that prevents her from engaging in any kind of work (Tr. at 4–4A). The ALJ did not have this document when making her decision.

Additionally, in a letter dated July 15, 1996, Dr. Travis wrote that plaintiff was unable to tolerate prolonged activity and that her functional status was significantly diminished.

I find both of these statements by plaintiff's treating physician supportive of her allegations of subjective complaints.

### 7. OTHER CONSIDERATIONS

The ALJ noted several other items in her discussion of plaintiff's subjective complaints.

She stated that when plaintiff came into the hearing room, she was carrying a three-inch stack of papers and folders and that she did so with no apparent difficulty. The ALJ does not state precisely how this fact is inconsistent with any one of plaintiff's subjective complaints. She does not estimate the weight of the papers, nor suggest how far or how long plaintiff might have carried them. It is difficult to imagine that the stack of papers plaintiff was carrying weighed more than five pounds. If the ALJ intended to suggest that carrying a stack of papers and files into the hearing is inconsistent with plaintiff's allegations of subjective complaints, that suggestion is unsupported by the record. Plaintiff testified that when she went grocery shopping she bought nothing heavier than a ten-pound bag of potatoes and that she was able to carry a light bag of groceries from her car to her house. I do not find carrying a stack of papers into the hearing inconsistent with plaintiff's testimony of what she was able to do.

The ALJ states that except for the August 1996 report of Dr. Abdou, plaintiff submitted no evidence of medical treatment, except for prescriptions, after March 1995. The ALJ states further that the absence of medical treatment is inconsistent with plaintiff's complaints. On both her Disability Report and her Reconsideration Disability Report, plaintiff wrote that she was seeing Dr. Aaron Travis once a month. Although the records from the two Doctors Travis do not go beyond March 1995, there is no reason to believe that plaintiff did not continue seeing one or the other regularly. At the time of the hearing, plaintiff wrote on the Claimant's Medications form that Dr. Aaron Travis had recently prescribed medication and in August 1996, Dr. Travis referred plaintiff to Dr. Abdou. All this indicates Dr. Travis

was still treating plaintiff. If the ALJ had concerns on the point, she might have questioned plaintiff at the hearing about her current medical treatment or requested additional records. There is no evidence that she did either. The ALJ's finding that plaintiff did not receive regular treatment after March 1995, is not supported by substantial evidence. *See Cookemboo v. Apfel,* 983 F.Supp. at 1278.

The ALJ states in her discussion of plaintiff's credibility that Dr. Wolfe, who noted that plaintiff was positive at all eighteen positive fibromyalgia trigger points, examined plaintiff at the request of plaintiff's attorney. It is not entirely clear what point the ALJ is attempting to make, but the record indicates that plaintiff is represented by David H. Bony. Dr. Wolfe saw plaintiff at the request of plaintiff's former employer, Robert K. Ball II, who also happens to be an attorney.

The ALJ also states in her credibility discussion that Dr. Aaron Travis characterized plaintiff's multiple diagnoses as "curious." Again, I do not know what point the ALJ is attempting to make. Dr. Travis has certified that plaintiff is, in his opinion, unable to work. There is no reason to think that Dr. Travis was suggesting that the diagnoses which he himself had made were somehow invalid. To infer that Dr. Travis intended to convey anything more than that the combination of diagnoses was interesting or unusual is absolutely unsupported by the record.

### B. CREDIBILITY CONCLUSION

My review of the record leads me to the conclusion that it does not contain substantial evidence to support the ALJ's decision to discount plaintiff's credibility and her subjective complaints. I find none of the ALJ's findings with regard to plaintiff's credibility is supported by the record. Further, I do not find inconsistencies in plaintiff's testimony or in the record as a whole that support a finding that her testimony of subjective complaints is not credible.

### VI. CONCLUSIONS

The vocational expert testified that an individual who required a nap, or fell asleep, or needed to lie down during the day, at times that were unpredictable and could not be scheduled during allowed breaks could not be gainfully employed.

Plaintiff testified that she suffers from extreme fatigue and tires very easily. Sometimes she is unable to stand long enough to complete her morning shower; she has to sit down, turn the water off and rest for a while. She is unable to sleep at night. She has a "real problem" with falling asleep during the day, especially if she sits for very long. She often has to lie down two or three times a day, often for two to three hours.

On her Reconsideration Disability Report, plaintiff wrote that she is unable to wear her contact lenses because she falls asleep so easily. She reported to Dr. Medhat that after the onset of her illness, but before she was forced to quit working, she was sleeping all the time and could not stay awake at work. She informed Dr. Travis that she was sleeping throughout the day.

Based on the testimony of the vocational expert and plaintiff's credible statements concerning her inability to stay awake during the day, I conclude that there is no work which plaintiff is able to perform and that she is disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.