**IT IS HEREBY ORDERED** that defendant's motion for acquittal is **DENIED.** [Doc. 55]

**IT IS FURTHER ORDERED** that defendant's motion for a new trial is **GRANTED.** A new trial date shall be set by separate order. [Doc. 56]

**David MILLER, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of Social Security, Defendant.**

**No. 02–3410–CV–S–BC–SSA.**

United States District Court,
W.D. Missouri,
Southern Division.

May 27, 2003.

Gerald Liljedahl, Springfield, MO, for plaintiff.

Judith Strong, Assistant United States Attorney, Kansas City, MO, for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

LARSEN, United States Magistrate Judge.

Plaintiff David Miller seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401, *et seq.* Plaintiff argues that (1) the ALJ improperly determined plaintiff's residual functional capacity by discrediting the opinion of plaintiff's treating physician, (2) the ALJ improperly discredited plaintiff's testimony, and (3) the vocational expert testimony relied upon by the ALJ was not a result of a proper hypothetical. I find that the ALJ erred in discrediting the opinion of Dr. Hwang and erroneously formulated a residual functional capacity that conflicted with the opinion of Dr. Hwang. Because defendant, on this record, is unable to establish that there are other jobs in the national or regional economy which can be performed by plaintiff, the ALJ erroneously found plaintiff not disabled. Therefore, plaintiff's motion for summary judgment will be granted and the decision of the Commissioner will be reversed.

### I. BACKGROUND

On January 26, 2001, plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since September 20, 2000. Plaintiff's disability stems from lumbar spine degenerative disc disease and lumbar spine surgery residuals. Plaintiff's application was denied initially. On April 11, 2002, a hearing was held before an Admin-

istrative Law Judge. On June 24, 2002, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On August 20, 2002, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

 Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Johnson v. Chater,* 108 F.3d 178, 179 (8th Cir.1997); *Andler v. Chater,* 100 F.3d 1389, 1392 (8th Cir.1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) (citing *Steadman v. Securities & Exchange Commission,* 450 U.S. 91, 99, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. at 401, 91 S.Ct. 1420; *Jernigan v. Sullivan,* 948 F.2d 1070, 1073 n. 5 (8th Cir.1991). However, the substantial evidence standard presupposes a zone of choice within which the

decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Id.; Clarke v. Bowen,* 843 F.2d 271, 272–73 (8th Cir.1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. *Griffon v. Bowen,* 856 F.2d 1150, 1153–54 (8th Cir.1988); *McMillian v. Schweiker,* 697 F.2d 215, 220–21 (8th Cir.1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, *et seq.* The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

Yes = not disabled.

No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

No = not disabled.

Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.

> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.

> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.

> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Terri Crawford, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

#### Earnings Record

Plaintiff's earnings record indicates that he earned the following income from 1986 (age 18) through 2000:

| Year | Income |
|------|--------|
| 1986 | $ 33.50 |
| 1987 | 0.00 |
| 1988 | 1,082.80 |
| 1989 | 1,024.99 |
| 1990 | 4,500.00 |
| 1991 | 7,800.00 |
| 1992 | 6,434.62 |
| 1993 | 12,035.25 |
| 1994 | 11,175.00 |
| 1995 | 14,037.73 |
| 1996 | 23,468.52 |
| 1997 | 30,631.00 |
| 1998 | 27,810.97 |
| 1999 | 30,304.81 |
| 2000 | 24,339.87 |

(Tr. at 70, 73).

#### Disability Report—Field Office

In an undated Disability Report—Field Office, Maurice Smith, Claims Representative, indicated that during a face-to-face meeting with plaintiff, Mr. Smith observed that plaintiff had difficulty sitting (Tr. at 76).

#### Letter from McKinney Bedding

In a letter dated January 8, 2001, Jim McKinney notified plaintiff that "[d]ue to the condition of your back and the lifting limit your doctor has set, it seems unlikely that you can physically do the job you were doing here before your surgery. We don't have a job that you would be able to do with these limitations. For these reasons, your employment with McKinney Bedding will be terminated effective January 31, 2001."

### B. SUMMARY OF MEDICAL RECORDS

Following is a summary of the medical records that are relevant to the issues in this case, to the extent they are legible.

On March 30, 1998, plaintiff saw Oran Ringen, M.D., at St. Johns Physicians and Clinics (Tr. at 143). Plaintiff was complaining of back strain. "Examination of the back reveals an old area of previous decompressional laminectomy without fusion at the L3, L5 area on the back. Examination reveals a positive straight-leg raising test on the right to about 25." X-rays were taken and sent to a radiologist, and Dr. Ringen prescribed Flexeril and Indocin. He told plaintiff to come back the following week, anticipated that he would need a CT scan, and opined that the most likely etiology was bulging disc at L3, L4.

That same day, Nathan Kester, M.D., a Radiologist at Springfield Clinic, reviewed plaintiff's x-rays (Tr. at 142). He noted that plaintiff had a history of low back

pain. His impression was partial sacralization of L5 [L5 vertebral body becomes incorporated into the S1 body].

On April 6, 1998, plaintiff returned to see Dr. Ringen for a recheck of his back (Tr. at 140). Dr. Ringen found radiculopathy down on the right which corresponds to a herniated disk at L4–L5. His assessment was probable disk herniation at L4–L5 on the right. He ordered a CT scan.

On February 24, 1999, plaintiff returned to see Dr. Ringen (Tr. at 132). Plaintiff complained of left leg pain, which was present before Dr. Canlas did plaintiff's last surgery a year and a half ago. Plaintiff had right leg pain that radiates all the way down into the heel. "He does tighten up and has muscle spasms palpable in the LS spine on flexion." Dr. Ringen prescribed Soma, Celebrex, and range of motion exercises.

On March 3, 1999, plaintiff returned to see Dr. Ringen (Tr. at 131). Plaintiff was still having back pain. Because of the pain syndrome and the radiation down the leg on the right side, plaintiff was given a Toradol injection, Naprosyn, Soma, and Ultram for severe pain. "He probably could use a SSRI inhibitor as well because there would be an enhanced effect between the two, so the next addition probably should be medication such as Prozac or Zoloft."

On March 5, 1999, plaintiff again saw Dr. Ringen (Tr. at 130). Dr. Ringen noted that plaintiff was "markedly improved on the Toradol and being held fairly well on the Naprosyn, but when he exerts he can feel some strain and pull." His assessment included status post decompression laminectomy with scarring, back pain secondary to muscle spasm and continued shrinking of scarring.

On March 19, 1999, plaintiff returned to see Dr. Ringen (Tr. at 129). Plaintiff continued to have muscle spasms. Back examination revealed palpable muscle spasms in the LS spine area. Dr. Ringen's assessment included low back strain/sprain injury with chronic low back pain secondary to previous decompression laminectomy × 2. He prescribed Soma, Ultram, and range of motion exercises.

On September 21, 2000, plaintiff saw Mark Emenecker, D.O., at St. John's Regional Health Center (Tr. at 125). Plaintiff complained of low back pain which traveled to the right side of his buttocks and down his leg to his foot. "He's had 2 prior back surgeries with some vaguely similar type of problems" Dr. Emenecker performed an examination and noted that plaintiff "appears in some degree of pain. Is sitting, leaning to the left, to avoid pressure on his right buttocks which seems to increase his pain.... Supine straight leg raising on the right caused pain at about 75 degrees of flexion of the hip.... There is tenderness in the right sacroiliac area down into the sacral sulcus." Dr. Emenecker prescribed Toradol for pain, Relafen, Soma for muscle spasms, Lorcet for severe back pain, stretching exercises, and a heating pad.

On September 25, 2000, plaintiff returned to see Dr. Emenecker (Tr. at 124). Plaintiff continued to suffer from low back pain, had been taking the Soma, Lorcet Plus, and Relafen and was not feeling a whole lot better. "Appears in moderate amount of distress. Is unable to sit normally with pain into his right buttocks. Needs to lay [sic] down on the left side to relieve the pain and even that does not completely take care of it. He has tenderness in the right sacral sulcus. Seated straight leg raising causes pain with the right leg to approximately 45 degrees from horizontal." Dr. Emenecker increased plaintiff's pain medication dosages.

On September 27, 2000, plaintiff saw James Sauer, M.D., a radiologist at St. John's Regional Health Center (Tr. at 99).

Plaintiff had an MRI of the lumbar spine due to back pain, right leg pain, and two previous surgeries. Dr. Sauer found that plaintiff's intervertebral disc spaces above L4 were normal, L5–S1 was normal, but as to L4–5 he wrote: "A large disc protrusion is present in the right paracentral space effacing the lateral recess. A moderate amount of surrounding epidural fibrosis [significant scar tissue] is present. The neural foramen remains widely patent."

On September 30, 2000, plaintiff called Dr. Emenecker and reported that he continued to suffer with back pain and he was out of his medication (Tr. at 123). Dr. Emenecker refilled plaintiff's Norco and Flexeril.

On October 9, 2000, plaintiff saw J. Mark Wilson, M.D., a radiologist at St. John's Regional Health Center (Tr. at 111–112). Dr. Wilson took lateral flexion and extension views of the lumbar spine. "Prominent dextroscoliosis of the lumbar spine in the standing AP projection. This may be due to muscle spasm."

On October 10, 2000, plaintiff saw J. Charles Mace, M.D., at Springfield Neurosurgical Clinic (Tr. at 104–106). His chief complaint was right leg and back pain. Pertinent physical findings were listed as follows: "On exam, he has 4/5 weakness of right extensor hallucis longus and anterior tibialis. He has pain in his low back with significant paraspinous muscle spasms. He walks with an antalgic gait and has obvious discomfort just sitting on the exam table.... There is significant fibrosis around [L4–5] as well, but the disc fragment does cause some mass effect."

On October 12, 2000, plaintiff returned to see Dr. Mace for his third back surgery (Tr. at 103, 107–110). Admitting diagnosis was recurrent right L–45 disk herniation, discharge diagnosis was recurrent right L4–5 disk herniation. Dr. Mace performed another right L4–5 laminectomy and microdiskectomy.

On October 25, 2000, plaintiff returned to see Dr. Emenecker (Tr. at 120–121). On exam, Dr. Emenecker noted that there was some left sided trapezius muscle spasms and tenderness to palpation. His assessment included "Cervical strain following his recent motor vehicle accident with tingling irritation in his arm at times. Probably from muscle spasms." He prescribed Naprosyn, Hydroxyzine, Flexeril, and range of motion exercises for the neck.

On November 13, 2000, plaintiff returned to see Dr. Mace for a follow up on the lumbar disc following surgery (Tr. at 151). Dr. Mace noted that plaintiff was having no significant leg pain, incision was nicely healed, and overall plaintiff was doing quite well. Plaintiff stated that he planned to change jobs from the heavy lifting kind of routine to something easier, and Dr. Mace wrote, "I concur with his plan to change jobs and avoid heavy lifting and bending."

In January 2001, plaintiff was terminated from his job because he could not perform the physical requirements, and he lost his health insurance.

On April 20, 2002, plaintiff saw Dr. Hwang (Tr. at 160). Plaintiff's mother made his appointment. Plaintiff complained of having spasms in his back, right leg, and foot. Plaintiff had pain in his neck and lower back which radiated to his ankle joint, and began suffering that pain sometime after his third surgery in 2000. He reported that his back was still painful. The pain in his low back was constant and "he can find no relief for the pain, cannot stand, bend or walk because of the pain." Most of the doctor's notes are illegible, but in several places he wrote R with an arrow down and L normal, indicating the tests he performed were normal on the left and reduced on the right. Diagnoses included herniated disc at L4–5, S1, the other two diagnoses are illegible.

On April 25, 2002, plaintiff returned to see Dr. Hwang (Tr. at 161–162). Plaintiff's right leg had a tingling sensation, he had numbness around his foot, and Dr. Hwang noted that plaintiff was limping. After a neurological exam, Dr. Hwang noted that plaintiff was shaking. His diagnoses were herniated disc L4–5 and low back pain with [illegible] lower extremities.

### C. RESIDUAL PHYSICAL FUNCTIONAL CAPACITY ASSESSMENT

On April 25, 2002, Dr. Hwang completed a Medical Source Statement—Physical making the following findings: Plaintiff can lift or carry less than 5 pounds frequently and less than 5 pounds occasionally; he can stand or walk continuously for 15 minutes and for a maximum of 2 hours during an 8–hour day; he can sit continuously for 15 minutes and for a total of less than an hour in an 8–hour day; his ability to push and pull is limited; he can never climb, kneel, crouch, or crawl; he can occasionally balance or stoop; he can frequently reach, handle, finger, feel, see, speak, and hear; and he should avoid concentrated exposure to extreme cold, extreme heat, weather, wetness, humidity, dust, fumes, vibration, hazards, and heights (Tr. at 155–156, 158–159). Dr. Hwang found that plaintiff needs to lie down for 30 minutes every two hours for pain relief (Tr. at 156, 159).

### D. SUMMARY OF TESTIMONY

During the April 29, 2002, hearing, plaintiff testified; and Terri Crawford, a vocational expert, testified at the request of the ALJ.

#### 1. Plaintiff's testimony.

At the time of the hearing, plaintiff had lived at his current residence in Springfield for the past two years (Tr. at 39). His wife and three children, ages 13, 11, and 10, live with him (Tr. at 39).

Plaintiff testified that his feet are almost always numb, he has pain in the back of his right leg, and it feels like he is pulling his muscle constantly when he steps down (Tr. at 32–33). He testified that he rarely has trouble with his left leg, it is just his right leg that bothers him (Tr. at 33). In addition to his leg pain, plaintiff experiences hip pain and lower back pain which he described as a burning sensation and sometimes stabbing pain (Tr. at 33). Plaintiff rated his back pain as a 7 or 8 most of the time, on a scale from 1 to 10 with 10 being the worst (Tr. at 33).

Plaintiff can never lie flat on his back because he cannot put his legs flat without experiencing spasms (Tr. at 33). When plaintiff has spasms, they usually last for a long time (Tr. at 33).

Plaintiff normally has two or three bad days per week (Tr. at 35). He has lost control of his balance and fallen in the past, so now he does not sleep in his bedroom because it is upstairs and he does not go down to the basement (Tr. at 35). Plaintiff's stair railings have come apart many times because he uses them to support himself and it pulls the railings out of the wall (Tr. at 35). Walking also causes plaintiff's muscles to "compress" (Tr. at 35).

Plaintiff sits in his recliner a lot and elevates his legs, which helps with the pain (Tr. at 35). He sits in his recliner most of the day every day (Tr. at 38).

Plaintiff has had surgery on his back three times (Tr. at 35–36). His most recent surgery was in October 2000 and was performed by Dr. Mace (Tr. at 36).

Plaintiff lost his job and his health insurance after his last surgery and could not afford to go to a doctor (Tr. at 36). Plaintiff's wife works in housekeeping at Holiday Inn; and because only three people in a family can receive Medicaid, his three

children have the coverage and he has none (Tr. at 36–37). Plaintiff's mother and brother paid for plaintiff to see Dr. Hwang (Tr. at 37). As of the time of the hearing, plaintiff had seen Dr. Hwang twice (Tr. at 42).

Plaintiff estimated he could sit comfortably for about 10 minutes and could stand about 10 minutes as well (Tr. at 37). When asked to estimate how far he could walk before needing to stand and rest, plaintiff said, "probably about two blocks in distance." (Tr. at 37). Plaintiff was asked how much weight he thought he could carry around all day, and he testified it would be less than 10 pounds because he cannot even run a vacuum cleaner for more than 10 minutes straight (Tr. at 37).

Plaintiff's last job was "supplying the line" (Tr. at 38). He would slide a screen over, push it over on the line, and throw covers or foam on top of it (Tr. at 38). The most he lifted was 15 to 20 pounds (Tr. at 38). Plaintiff lost his job because he was unable to move the 15 to 20 pounds anymore according to Dr. Mace's restrictions (Tr. at 38).

In an average month, plaintiff may drive up to 10 miles (Tr. at 43). For example, he may drive to the bank to deposit his wife's check once in a while (Tr. at 43–44). Plaintiff never goes to the post office, never goes to the grocery store, and never does yard work (Tr. at 44, 45). Plaintiff never cooks or does laundry, but he does the dishes about once or twice a week (Tr. at 45). The ALJ asked plaintiff if he could vacuum, and plaintiff said he has tried but can only do small sections at a time (Tr. at 45). He had not even tried to run the vacuum in several months (Tr. at 45). In a typical day, plaintiff will sleep for 13 to 14 hours, he sits in his recliner 5 to 6 hours, and he sits upright for a total of an hour each day (Tr. at 47).

## 2. Vocational expert testimony.

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge. Ms. Crawford testified that plaintiff's past relevant work consists of mattress maker, which was medium semi-skilled labor, and auction assistant, which was light unskilled work (Tr. at 48).

The ALJ's first hypothetical included a person with plaintiff's age, education, and work history who could lift up to 20 pounds occasionally and 10 pounds frequently; could stand or walk about 3 hours a day and for 30 minutes at a time; could sit for 7 hours a day and for 30 minutes at a time; could occasionally bend, stoop, crouch, and squat (Tr. at 48). The vocational expert testified that such a person could be a charge account clerk, with 208,-000 such jobs in the country and 1,600 in Missouri (Tr. at 49). The person could also be an office helper, a light unskilled job with a sit/stand option (Tr. at 49). There are 268,000 such jobs in the country and 2,700 in Missouri (Tr. at 49).

The ALJ's second hypothetical included the same limitations as the first hypothetical but added the condition that the person should avoid climbing, balancing, heights, and hazardous unprotected moving equipment (Tr. at 49). The vocational expert testified that such a person could perform the same jobs as the person in the first hypothetical (Tr. at 49).

The ALJ's third hypothetical added the condition that the person should avoid kneeling, crawling, and crouching (Tr. at 49). The vocational expert testified that those additional restrictions would not prevent the person from performing the original two jobs (Tr. at 49).

The ALJ's fourth hypothetical added the condition that the person needs some time—in excess of regular breaks—to lie down during the day (Tr. at 49). The

vocational expert testified that there is no job that such a person could perform (Tr. at 49).

Plaintiff's counsel asked the vocational expert if a person suffering from the conditions outlined in the Medical Source Statement of Dr. Hwang could perform any work (Tr. at 49–50). The vocational expert testified that such a person could perform no work (Tr. at 50). Plaintiff's counsel also asked the vocational expert whether a person suffering from the functional restrictions as testified to by plaintiff would be able to perform any job (Tr. at 50). The vocational expert testified that there is no work such a person could perform (Tr. at 50).

### V. FINDINGS OF THE ALJ

On June 24, 2002, the ALJ issued his opinion finding plaintiff not disabled at step five of the sequential analysis.

The ALJ found at step one that plaintiff has not worked since his onset date, September 20, 2000 (Tr. at 15). AT step two, the ALJ found that plaintiff suffers from lumbar spine degenerative disc disease and status post lumbar spine surgery residuals, and that his impairment is severe (Tr. at 15). At step three of the analysis, the ALJ found that plaintiff's impairment does not meet or equal a listed impairment (Tr. at 16).

Before determining plaintiff's residual functional capacity, the ALJ found plaintiff not credible, and analyzed the opinion of Dr. Hwang and gave it little weight (Tr. at 17–19). He found that plaintiff retains the residual functional capacity to lift and/or carry up to 20 pounds frequently and 10 pounds occasionally; stand and/or walk 3 hours in an 8–hour day and up to 30 minutes continuously; sit for 7 hours in an 8–hour day and for 30 minutes continuously; and could occasionally bend, stoop, crouch, or squat (Tr. at 19). With that residual functional capacity, plaintiff is un-

able to return to his past relevant work (Tr. at 21).

Finally, at the fifth step of the sequential analysis, the ALJ found that plaintiff could perform sedentary, unskilled work such as charge account clerk, or light, unskilled work such as office worker (Tr. at 20). He found that both of those jobs are available in significant numbers in the national and regional economies (Tr. at 20).

### VI. PLAINTIFF' RESIDUAL FUNCTIONAL CAPACITY

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity after discrediting the opinion of Dr. Hwang, plaintiff's treating physician.

■ Social Security regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted "controlling weight," provided the opinion is well-supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Edwards v. Barnhart,* 314 F.3d 964, 967 (8th Cir.2003); *Prosch v. Apfel,* 201 F.3d 1010, 1012–13 (8th Cir. 2000). If the opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. *Edwards v. Barnhart,* 314 F.3d at 967.

■ In this case, the ALJ discredit the opinion of Dr. Hwang, plaintiff's treating physician, and justified his decision as follows:

[T]he Medical Source Statement–Physical (MMS–P) completed by Dr. Hwang is the opinion of a physician who had limited contact with the claimant, seeing him only two times; treating him once. Dr. Hwang's opinion does not accurately reflect the evidence in the record and is not supported by objective medical evi-

dence. The limitations established by Dr. Hwang in the Medical Source Statement appear to be based primarily on the subjective statements of the claimant, rather than objective tests or findings, and reflect limitations expected of a bedridden claimant. The claimant, himself, admits he is not bedridden, therefore, the undersigned affords little weight to Dr. Hwang's opinion.

(Tr. at 19).

The ALJ's analysis here is flawed for several reasons. First, the ALJ concluded that Dr. Hwang's opinion does not accurately reflect the evidence in the record. The ALJ offers no basis for this conclusion. To the contrary, the medical evidence establishes that for several years, plaintiff has suffered from back pain severe enough to result in surgery on three different occasions. Each time, plaintiff's back healed after surgery only to begin hurting again to the point of needing additional surgery. Plaintiff's other treating physicians have found muscle spasms in the LS spine area, have observed that he appeared to be in pain and was unable to sit or walk properly because of his pain, and have prescribed medication to help him with his pain. I find nothing in Dr. Hwang's notes that contradicts anything found in any of the other doctor's notes.

The ALJ further states that Dr. Hwang's opinion "is not supported by objective medical evidence." Dr. Hwang's opinion *is* objective medical evidence, it need not be *supported* by objective medical evidence. Rather, the opinion should be supported by "medically acceptable diagnostic techniques." Here, Dr. Hwang examined plaintiff, a fact established by both the records and plaintiff's testimony, and he arrived at a diagnosis on two separate occasions. The ALJ has offered no reason why Dr. Hwang's examination was less than sufficient to arrive at his diagnoses.

The ALJ concludes that the opinion "appear[s] to be based primarily on the subjective statements of the claimant, rather than objective tests or findings". However, again, the ALJ does not state why Dr. Hwang's examinations were not sufficient, and demonstrates no analysis to show how he reached his conclusion that plaintiff effectively dictated Dr. Hwang's opinion.

The ALJ stated that Dr. Hwang's findings "reflect limitations expected of a bedridden claimant." Such a statement is based on no evidence and contradicts Dr. Hwang's opinion. Dr. Hwang found that plaintiff could stand or walk for 15 minutes at a time and for 2 hours during the day. Such a finding is certainly not consistent with being bedridden. Therefore, the fact that plaintiff did not say he was bedridden actually supports Dr. Hwang's opinion, it does not provide justification for discrediting Dr. Hwang's opinion.

Finally, the ALJ discredits Dr. Hwang's opinion because plaintiff saw him on only two occasions. Ordinarily, this may be a reason for giving the opinion somewhat less weight. However, in this case, that fact is irrelevant since there is no medical evidence in the record which contradicts the opinion of Dr. Hwang.

Therefore, I find that the ALJ erred in discrediting the opinion of Dr. Hwang, including the Medical Source Statement— Physical completed by Dr. Hwang on April 25, 2002.

■ The ALJ's residual functional capacity finding, on the other hand, is based on no evidence at all. The only other Medical Source Statement in the record was prepared by someone who is not a doctor, and the ALJ specifically stated that the opinion would therefore be given the same weight as the opinion of a lay person. Therefore, because there is no evidence in the record contradicting the only Medical Source Statement in the rec-

ord prepared by a doctor (and plaintiff's treating doctor at that), I find that the ALJ erred in formulating a residual functional capacity assessment that differed from the opinion of Dr. Hwang.

## VII. CONCLUSIONS

The vocational expert testified that a person with the residual functional capacity as set out by Dr. Hwang would not be able to perform any job. Therefore, it is unnecessary to address the other issues raised by defendant. However, I do point out that the ALJ's credibility analysis also contained obvious flaws. For example, the ALJ found that plaintiff's lack of medical records from 2001 to 2002 showed that he was not disabled. The ALJ ignored plaintiff's testimony that he lost his insurance in January 2001 and was unable to afford medical bills. He also ignored the fact that when plaintiff's mother paid for him to go to Dr. Hwang in 2002, Dr. Hwang found that plaintiff's condition had not improved since he last got medical treatment in late 2000. The ALJ also found that because plaintiff was not taking prescription medications, he was precluded from being found disabled. Again this ignores the fact that plaintiff was unable to seek medical treatment, and also ignores the fact that while being treated prior to 2001, plaintiff was prescribed various medications for severe pain. The ALJ found that plaintiff's daily activities are inconsistent with disability because he could vacuum and drive to the bank to cash checks and make deposits. However, plaintiff testified that he had not attempted to vacuum in approximately 4 months, and his total driving in an entire month did not exceed 10 miles.

Based on all of the above, I find that the ALJ erred in discrediting the opinion of Dr. Hwang and erroneously formulated a residual functional capacity that conflicted with the opinion of Dr. Hwang. Because defendant, on this record, is unable to establish that there are other jobs in the national or regional economy which can be performed by plaintiff, the ALJ erroneously found plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.